## MACBETH-EVANS GLASS CO. v. GENERAL ELECTRIC CO.

(Circuit Court of Appeals, Sixth Circuit. November 6, 1917.)

No. 2900.

1. PATENTS ⬤➾83—RIGHT TO PATENT—USE OF INVENTION AS TRADE SECRET.
   The right to preserve a monopoly in an invention by its use as a trade secret for profit, and the right to secure its protection under the patent laws, are inconsistent.

2. PATENTS ⬤➾83—RIGHT TO PATENT—USE OF PROCESS AS TRADE SECRET.
   An inventor of a process who used it in secret for nearly 10 years, placing the product on public sale, cannot thereafter, when difficulty is encountered in protecting the secret, obtain a patent, and thus extend his monopoly for the patent term, but will be held to have elected to abandon his right to a patent.

3. PATENTS ⬤➾83—RIGHT TO PATENT—"ABANDONMENT."
   The policy of the patent law is to secure to the public the full benefit of inventions after expiration of the fixed term deemed sufficient to reasonably stimulate invention, and any action of an inventor which would defeat such policy by withholding his invention from the public for an indefinite time for his own profit will operate as an abandonment of his right to a patent, which in every sense material to the patent laws is tantamount to an "abandonment" to the public of the invention itself.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Abandonment.]

4. PATENTS ⬤➾328—VALIDITY—PROCESS FOR MAKING GLASS.
   The Macbeth reissue patent, No. 13,766 (original No. 1,097,600), for a formula and process for making glass, held void for abandonment.

---

⬤➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; John H. Clarke, Judge.

Suit by the Macbeth-Evans Glass Company against the General Electric Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 231 Fed. 183.

Paul Synnestvedt, of Philadelphia, Pa., Joseph Wilby, of Cincinnati, Ohio, and James I. Kay and James C. Bradley, both of Pittsburgh, Pa., for appellant.

Squire, Sanders & Dempsey, of Cleveland, Ohio (F. P. Fish and W. K. Richardson, both of Boston, Mass., and William L. Day, of Cleveland, Ohio, of counsel), for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. This was a suit for infringement of letters patent reissue 13,766, bearing date July 7, 1914, to George A. Macbeth, assignor to Macbeth-Evans Glass Company, a corporation of Pennsylvania. The invention relates to a "method and batch or mixture for making glass for illuminating purposes such as in electric and other shades and globes." The pleadings present the usual issues of a patent suit, except that a distinct defense was introduced and made the basis of the decision. This was brought about in pursuance of Equity Rule 29 (198 Fed. xxvi, 115 C. C. A. xxvi), and on motion of defendant below, the General Electric Company, separately to hear and dispose of the defense set up in paragraph 14 of its answer; the facts, for purposes of the motion and hearing, being stated in a written admission of plaintiff below, Macbeth-Evans Glass Company, which was filed with the motion. According to the facts so shown, George A. Macbeth discovered and perfected the formula and process in issue prior to the fall of 1903. About the fall of that year, the appellant company (with which Macbeth was connected as president and stockholder) commenced to use the formula and process "as secret inventions for making illuminating glass," and thereafter continued such use until the application of Macbeth for the original letters patent (No. 1,097,600) was filed, May 9, 1913. Throughout this period the products of the formula and process were "put upon the market and sold in this country in large quantities as regular articles of trade and commerce."

In May, 1910, one of the plaintiff company's employés, who had been intrusted with the secrets of the invention set out in the reissued letters patent, left the company's employ and without its knowledge and in fraud of its rights disclosed these secrets to officials of the Jefferson Glass Company; and prior to the 17th of the following December that company began a secret use of the invention and continued such use until after application was made for the patent as stated, May 9, 1913, and placed the products upon the market and sold them in this country

as "regular articles of trade and commerce continuously from and after a date prior to December 17, 1910."

On the last-mentioned date, appellant commenced an action in the common pleas court of Allegheny county, state of Pennsylvania, against its former employé and the Jefferson Glass Company, including also a salesman of appellant who had left its employ and entered that of the Jefferson Glass Company, praying injunction against disclosures of the secrets to others and further manufacture and sale of glass under the secret formula and process. January 30, 1912, decree was entered in that court enjoining defendants from making any glass "by substantially said secret process and formula and from disclosing the same to others." This decree was affirmed by the Supreme Court of Pennsylvania January 6, 1913. Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 Atl. 688.

The instant case was heard below upon the facts thus in substance stated. District Judge, now Mr. Justice, Clarke, entered a decree adjudging the patent in suit to be void "because the discovery was used in the manner stated in the stipulation for almost ten years before the patent in suit was applied for, and was therefore abandoned, and also because the invention described in the patent was in public use more than two years prior to the application of (for) the patent" (231 Fed. 183, 190); accordingly, the bill was dismissed. The Macbeth-Evans Glass Company appeals.

[1, 2] The question is whether one who has discovered and perfected an invention can employ it secretly more than nine years for purposes only of profit, and then, upon encountering difficulty in preserving his secret, rightfully secure a patent, and thus in effect extend his previous monopoly for the further period fixed by the patent laws. Are both of these courses consistent with a reasonable interpretation of the constitutional provision and the statutes of the United States in relation to patents?

It is earnestly contended for appellant that its rights under the patent in issue are to be tested (1) by the use that was made of the invention, rather than of the product of the invention, prior to the application for a patent, and (2) by the acts if any of appellant and its assignor Macbeth, which would evince an intent to abandon the invention as distinguished from the right to patent the invention. The argument is that, when the acts of Macbeth and appellant are tested by the language of the patent laws, the secret use made of the invention could not have been a public use, and the constant effort made to preserve the secret was inconsistent with intent to abandon the invention; and consequently that the public use and the abandonment contemplated by the patent laws are inapplicable to the present case. The statutory provisions relied on are sections 4886 and 4920, Rev. Stat. (16 Stat. § 24, p. 201, section 61, p. 208 [Comp. St. 1916, §§ 9430, 9466]). Section 4886 provides:

"Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, * * * not known or used by others in this country, and not patented, or described in any printed pub-

lication in this or any foreign country, before his invention or discovery thereof, and not in public use or on sale for more than two years prior to his application, unless the same is proved to have been abandoned, may * * * obtain a patent therefor."

Section 4920 enumerates "special matters" which in an action for infringement may upon notice be proved under the general issue, and among them:

"Fifth. That it [the invention or discovery] had been in public use or on sale in this country, for more than two years before his application for a patent, or had been abandoned to the public."

The existence of all the conditions thus prescribed is essential alike to the right to issue or to obtain a patent; the absence of any one of the conditions is fatal. It is to be added that section 4884 (Comp. St. 1916, § 9428) limits the grant of every patent to a "term of seventeen years." The requirements and the limitation so imposed existed at the date of the patent in issue, and they were enacted in virtue of the power vested by the Constitution in Congress "to promote the progress of science and useful arts, by securing for limited times to * * * inventors the exclusive right to their respective * * * discoveries." Article 1, § 8. These provisions at once define a public purpose and the restrictions under which it is intended to be accomplished. The subject is a broad one; but the compass of the present case is restricted. No decision has come to our attention upon facts precisely like those here involved; in a word, the case is sui generis. It is not necessary, we may observe, to consider the portion of the decision below which deals with the question of public use. Our consideration will be limited to questions pertinent to abandonment.

In considering the subject of abandonment we assume that the patent is for a process which is not unitary with the product. If, indeed, this patent is for a process, and if the process and the product are distinct inventions separately patentable (as has been held in more or less analogous situations—the Leeds-Catlin Case, 213 U. S. 301, 318, 29 Sup. Ct. 495, 53 L. Ed. 805; the Acetylene Case, 192 Fed. 321, 325, 326, 112 C. C. A. 573 [C. C. A. 6], and see Judge Lurton's comment in the Sanitas Case, 139 Fed. 551, 552, 553, 71 C. C. A. 535 [C. C. A. 6]), there are some difficulties in the way of concluding that secret use of the process resulting in public use and sale of the product constitutes the statutory public use of the invention. It is these difficulties which we pass by when we make, for the purpose of the opinion, the assumption just stated.

It is in substance urged for appellee that there is distinct inconsistency between the right to a trade secret and the right to a patent; and that Macbeth, having elected to use his invention as a trade secret for some ten years instead of applying for a patent, could not under settled principles of the doctrine of election turn around and assert the inconsistent right to a patent. It is not entirely clear whether appellee's counsel mean that the right to practice an invention in secret and for profit is inconsistent with the right to obtain a patent for the

invention or with the right acquired under a granted patent; but we understand them to treat the trade secret as the invention. Macbeth, like any inventor of a new and useful object, possessed the right to practice his invention in secret and for profit, though the secret was the sole source of protection for the invention. He had no right to exclude others from legitimate discovery and use of the invention (John D. Park & Sons Co. v. Hartman, 153 Fed. 24, 29, 82 C. C. A. 158, 12 L. R. A. [N. S.] 135 [C. C. A. 6]; Chadwick v. Covell, 151 Mass. 190, 191, 23 N. E. 1068, 6 L. R. A. 839, 21 Am. St. Rep. 442); but he had an inchoate right to the exclusive use of the invention, which right, apart from the issues of the instant case, he might have perfected and made absolute by proceeding in the manner required by the patent laws (Gayler v. Wilder, 51 U. S. [10 How.] 477, 492, 13 L. Ed. 504); and while this was the only step open to him to secure the absolute right to exclude others (Paper Bag Case, 210 U. S. 405, 424, 425, 28 Sup. Ct. 748, 52 L. Ed. 1122; Herman v. Youngstown Car Mfg. Co., 191 Fed. 579, 584, 112 C. C. A. 185 [C. C. A. 6]; Swindell v. Youngstown Sheet & Tube Co., 230 Fed. 438, 442, 144 C. C. A. 580, and citations [C. C. A. 6]), yet he failed to take the step. Hence the controversy as to inconsistency of rights must relate to the unpatented invention and so present the question, whether there is inconsistency between the right to practice an invention in secret without limit of time and for profit and the right to obtain a patent on the invention. Counsel for appellant say that these rights are different but not inconsistent. Such rights are important here only in their relation to a patentable invention. In this relation they seem to us to be inconsistent; inherently considered, their use can lead only to opposed ends—the one to reject and the other to seek a patent. The test of this will be aided by contrasting what was admittedly done in the exercise of the first of these rights with the claimed retention of the other.

When Macbeth perfected his invention in 1903 he and his company evidently concluded to control and use it for purposes of profit, and to work out these ends by practicing the invention in secret and placing the product on public sale. The plain object of such a course was to exclude others from using the invention and to secure its benefits for themselves. The adoption of this course signified by necessary implication a belief that the nature of the invention would enable them in this way to protect it for a substantial period of time, if not for a longer time than could be secured under the patent laws. The result shows that their belief was justified for a period of nearly ten years. True, it is admitted and rightly that the inventor and his company adopted and pursued this plan with knowledge that the invention, as already pointed out, furnished them no protection against use by others who might honestly discover it. This, however, inevitably concedes an intent either to abandon the right to secure protection under the patent laws, or to retain such right and if necessity should arise then to obtain through a patent a practical extension of any previous exclusive use (secured through secrecy) into a total period be-

yond the express limitation fixed by those laws. If the first of these hypotheses be the true one, it is not easy to see how the right to secure patent protection survived. The second hypothesis presents the two rights claimed and which it is said could not both be retained because of their inconsistency.

The conduct of the parties in carrying out the scheme of secret use and profit is appropriate evidence of its object and effect. It would be a contradiction to say that an inventor could both give up and hold the right to secure a patent. Here we have a continuous and uniform course of conduct for upwards of nine years; this would certainly be sufficient in any other sort of controversy to establish a definite intent; and, as if to accentuate their intent, the present inventor and his assignee engaged in serious litigation to maintain their scheme of secret use. It is impossible to see how such a course of conduct is reconcilable with a subsisting purpose to adhere to the right to secure a patent; it has every token of practical repudiation of such a' purpose. Admittedly, we may repeat, these things were all done in the exercise of the right to adopt and pursue the scheme of secret use and profit; 'and it will not escape attention that the logic of this admission would lead to 'the same result as respects a purpose to retain the 'right to a patent if the plan had been pursued for a much longer time.

[3] All this is strengthened by distinct provisions of the patent laws. We refer to the provision, already pointed out, which limits the grant of every patent to a "term of seventeen years"; and also to section 4888 (Comp. St. 1916, § 9432), which requires that the application shall contain such a description of the invention as will "enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same." The relation of this exaction to the term fixed for a grant is manifest. The two provisions define a policy which was enacted in the interest of the public. When a patent expires, the right to practice the invention thus becomes available to everybody. The object of such a limitation and disclosure was to secure to the public the full benefits of patented objects as speedily as was consistent with reasonable stimulation of invention. If then we assume that the course adopted by the present inventor and his assignee did not contemplate an intent to abandon the right to secure a patent, it certainly did contemplate an indefinite delay in disclosure of the invention and a practical and substantial enlargement of any period of monopoly recognized by statute. Can it be doubted that this was opposed to a declared and subsisting public policy?

Enough, however, has been shown of the practical construction and effect of the right to practice an invention in secret and for profit and the right to obtain a patent on the invention fairly to test the soundness of the claim that the rights are not inconsistent. They of course are now to be considered with reference to a scheme which includes an effort to secure a patent. And so regarded we may safely add to what we have already said of these rights that the first is in its nature and

essence susceptible of exercise only in a way to evade, or at least unduly to delay, a disclosure of the invention in the interest of science and the useful arts, and with an intent to expand the statutory period of monopoly and thereby reap additional profits.  The second is a means simply to acquire a monopoly subject to all the conditions and limitations of the patent laws.  Such rights in our opinion are inconsistent in themselves—notably in the matter of profits available through use as distinguished from sale of the invention—and in their respective relations to the patent laws.  It is not conceivable that an inventor can consistently hold both rights throughout the same period of time, where the design is to use them for purposes and with results like or similar to those here shown.  We understand the rule of election to be broad enough to reach such rights as these; in Birmingham v. Kirwan, Lord Chancellor Redesdale said: "The rule of election seems to me to apply to every species of right."  2 Schoales & Lefr. 442, 450.  And we think that in this case Macbeth was put to a choice, an election.  In Wm. W. Bierce, L'D. v. Hutchins, 205 U. S. 340, 346, 27 Sup. Ct. 524, 525 (51 L. Ed. 828), Mr. Justice Holmes in delivering the opinion of the court said:

"Election is simply what its name imports; a choice, shown by an overt act, between two inconsistent rights, either of which may be asserted at the will of the chooser alone."

So many applications have been made of the rule, thus so clearly stated, that it is not necessary to refer to more of them than appear in the opinion in that case.  It is settled that when a choice of inconsistent rights is once made by a person having the right of election and also knowledge or means of knowledge of the essential facts, he is concluded by his action.  Here the choice made was deliberate and is unmistakable; it was the secret use for profit and was persisted in for years.  If the right to secure protection of the patent laws can be effectively repudiated, it certainly has been here.

This conclusion is reinforced by other considerations of a kindred character which lead to a like result.  When the application for a patent was made we think the invention had in legal effect been abandoned.  This is plainly related to the question whether there was an election, equivalent to an abandonment, and is of course a question individual to each case.  True, as we have seen, it is contended that the efforts made here to preserve the secret were not reconcilable with an intent to abandon the invention.  This is based on the theory that in the absence of intervening rights of other inventors a perfected invention may in point of time be indefinitely used in secret and for profit and also in entire consistency with the right to secure a patent on the invention; in a word, that persistence in such secret use, no matter for what length of time, will not justify an inference of abandonment of the invention.  The abandonment contemplated by the patent laws naturally has reference to the advantages and protection alike which are obtainable under those laws.  Abandonment in this sense must have been intended to signify a relinquishment of patent

privileges. Kendall v. Winsor, 62 U. S. (21 How.) 322, 329, 16 L. Ed. 165. As Macomber says:

"Abandonment must reside in the acts of the inventor by which he has deprived himself of the right to establish or enjoy the monopoly which he might have secured." Macomber, Fixed Law of Pat. (2d Ed.) 2; Walker on Patents (5th Ed.) § 91, at page 110.

Otherwise stated, abandonment of patent privileges is in every sense material to the patent laws tantamount to abandonment of the invention itself; and, of course, proof of such relinquishment or abandonment may be shown by conduct inconsistent with any other purpose. Rifle & Cartridge Co. v. Whitney Arms Co., 118 U. S. 22, 24, 25, 6 Sup. Ct. 950, 30 L. Ed. 53; Planing Machine Co. v. Keith, 101 U. S. 479, 484, 25 L. Ed. 939.

What has already been shown in respect of appellant's and its assignor's conduct in connection with the question of election is clearly pertinent to the question of abandonment and so need not be repeated. Appellant also contends, it is true, that it is necessary to prove abandonment of the invention to the public. There could be no abandonment that would not inure to the benefit of the public, since the public could be the only possible beneficiary of such a relinquishment; this would be equally true if the invention were cast away or destroyed and the circumstances of the act or conduct of the inventor were consistent only with an intent to abandon the invention. This we think fairly accounts for the use of the words "had been abandoned to the public." Paragraph 5, § 4920. When the intent then of sections 4886 and 4920, paragraph 5, is kept in mind, they may be as literally interpreted as counsel claim they must be, and yet forbid issue of the patent in suit. The views thus expressed are fortified by the rule that abandonment may take place at any time. Elizabeth v. Pavement Co., 97 U. S 126, 134, 24 L. Ed. 1000. That rule differs and ought to differ from the statutory rule enacted with reference to the public use of an invention or the act of placing it on sale, since abandonment in itself signifies surrender of the right to a patent. This would seem to indicate a strong reason, if not the very reason, for the omission to prescribe a distinct period within which a patent must be applied for after an invention is perfected. Further, the fact that the public may in some such instances lose the advantages of inventions cannot impair the force and effect of the inventor's conduct, for in all instances abandonment in terms prevents the issue of a patent.

There is still another view to be taken of the course pursued by the present inventor and his assignee. Their conduct was inconsistent with the duty of diligence resting upon an inventor desiring to patent his invention. This duty was in effect defined by the Supreme Court as early as 1829, when, speaking through Mr. Justice Story, it was in substance declared that withholding disclosure of an invention for a long period of time and for purposes only of profit was opposed to the intent and policy of the constitutional provision and the statutes in relation to patents. At that time the patent laws contained no provision

respecting abandonment of an invention; this, however, cannot be important since an abandoned invention could never have been intended to be made the subject of a patent. Moreover, this rule of diligence was also declared by Mr. Justice Daniel, speaking for the Supreme Court, in 1858 in respect of a patent which had been issued after the introduction into the patent statutes of a provision in effect the same as the present one concerning abandonment. In Pennock v. Dialogue, 2 Pet. 1, 7 L. Ed. 327, an infringement suit, the invention involved was perfected in 1811 and the patent obtained in 1818; the patent was for an improvement in the art of making water hose. In this interval the inventors had permitted one Jenkins, under an agreement as to price, to use the invention and to sell the product so derived. During much of the time Jenkins was in the service of the inventors and had been instructed by them in the art of making the hose. Verdict and judgment were recovered by defendant in the court below. The statute then applicable authorized a patent to be granted upon application of any citizen who should allege that he had invented a new and useful art, machine, etc., "not known or used before the application." The true meaning of these words was the ultimate question for decision. It was held that, since it would have defeated the object of the law to apply to the inventor the words "known or used," the clause meant that the thing invented was "not known or used by the public, before the application." After determining the question of use as stated, and presumably in view of the lapse of some seven years between the time the invention was perfected and the patent issued, Mr. Justice Story, in announcing the opinion of the court affirming the judgment of the court below, said:

"And thus construed, there is much reason for the limitation thus imposed by the act. While one great object was, by holding out a reasonable reward to inventors, and giving them an exclusive right to their inventions for a limited period, to stimulate the efforts of genius; the main object was 'to promote the progress of science and useful arts'; and this could be done best, by giving the public at large a right to make, construct, use and vend the thing invented, at as early a period as possible, having a due regard to the rights of the inventor. If an inventor should be permitted to hold back from the knowledge of the public the secrets of his invention; if he should, for a long period of years, retain the monopoly, and make and sell his invention publicly, and thus gather the whole profits of it, relying upon his superior skill and knowledge of the structure; and then, and then only, when the danger of competition should force him to secure the exclusive right, he should be allowed to take out a patent, and thus exclude the public from any further use than what should be derived under it, during his fourteen years; it would materially retard the progress of science and the useful arts, and give a premium to those who should be least prompt to communicate their discoveries."

The rule of diligence thus declared in respect of an inventor who has perfected his invention was affirmed in Kendall v. Winsor, 62 U. S. (21 How.) 322, 328 (16 L. Ed. 165); Mr. Justice Daniel saying:

"* * * The inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts

of Congress. He does not promote, and, if aided in his design, would impede, the progress of science and the useful arts. And with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefited not intended to benefit."

And again (329):

"* * * He may forfeit his rights as an inventor by a willful or negligent postponement of his claims. * * *"

We do not overlook the contentions of counsel in relation to these two decisions. It is said of Pennock v. Dialogue that the statutory change subsequently made declaring specifically the effect of "public use," in place simply of "use," was designed to prevent a "secret use" from invalidating a patent, and so was intended to change the rule of law laid down in that case; it is said moreover that this effect of the change was recognized in Kendall v. Winsor. We do not so understand the subsequent legislation nor the decision in Kendall v. Winsor. The statutory change from "use" to "public use" was simply to state distinctly in the new statute what Mr. Justice Story held the old one to imply. The contention then that the change was in effect to prevent a secret use from invalidating a patent and to overrule Pennock v. Dialogue is opposed not only to the reason there expressed for construing use to mean public use, but also to the ruling made in that case, and again in Kendall v. Winsor long after the statutory change took place, against any method of withholding an invention from the public for purposes of profit and of seeking later, through application for a patent, to extend the period of monopoly. And as respects Kendall v. Winsor, we think counsel are mistaken in supposing that it is not in harmony with Pennock v. Dialogue. This may be readily seen by comparison of the instructions asked by defendants and denied below in the Kendall-Winsor Case with the instructions there given by the learned trial judge (62 U. S. 325–327, 16 L. Ed. 165), in connection with the proofs offered. Opposed testimony had been offered at the trial below concerning Winsor's use of the invention prior to his application for a patent and as to the acts of one of his employés who had left his position and, in violation of a pledge of secrecy concerning knowledge he had obtained of the invention, constructed some machines for defendants below in accordance with the invention. The plaintiff below had also offered testimony tending to show that what he had done with respect to making and selling harness was to remedy defects found in his invention and to simplify and otherwise improve it, and further that he had "constantly intended to take letters patent when he should have perfected the machine." All this testimony was submitted to the jury with the instructions given, as stated, and the verdict and judgment were in favor of the plaintiff below, the patentee. The conclusive effect then of the verdict, as well as the judgment, in that case was that the use made of the invention prior to the application was experimental and made under a constant purpose to apply for a patent when the invention had been perfected; and the opinion of Mr. Justice Daniel discloses entire approval of the reasoning and opinion of Mr. Justice Story in Pennock

v. Dialogue. Following the decision in Pennock v. Dialogue it was held by the Circuit Court for the District of Columbia in Spear v. Belson, Fed. Cas. No. 13,223, 22 Fed. Cas. 903, that:

"Belson had no right to use his invention privately for his own gain for five years, and then expect and claim a monopoly from the public for fourteen years more."

Spear v. Belson, as also Pennock v. Dialogue and Kendall v. Winsor, were followed in Lovering v. Dutcher, Fed. Cas. No. 8,553, 15 Fed. Cas. 1001, 1002. Mr. Walker, in his work on Patents (5th Ed., p. 110), treats failure to observe the rule of diligence, where the delay is for purposes of private gain, as actual abandonment. Mr. Frost, however, while recognizing doubt where the inventor resorts to a secret use for purposes of profit, thinks that in England a patent may be granted in spite of the secret use (1 Frost, Pat. Law & Pr. [4th Ed.] 123, 128–131); but it is to be observed that in Morgan v. Seaward, 1 Web. Pat. Cas. 187, 194, Baron Parke said:

"If the inventor could sell his invention keeping the secret to himself, and when it was likely to be discovered by another take out a patent, he might have a monopoly for a much longer period than fourteen years."

Further, in Germ Milling Co., Limited, v. Robinson, 3 Rep. Pat. Cas. 399, 408, Lord Justice Bowen said:

" * * * It has been thought and may be thought by a certain class of persons to be hard law that the patentee must not make a beneficial use to himself of the invention before he takes out his patent, on the other hand it is to be remembered that if a patentee should be allowed to sell his mysterious and secret product first for a substantial period of time, and then to take out a patent for his invention, he would be able to give himself a longer monopoly than the law gives him; he would be able first of all to give himself a monopoly during the time he was selling his product made secretly, and then he would be able to get the years of monopoly which the statutes give him; so that there is no particular reason to think that the law has been unintentionally left in the state in which it is." [1]

We therefore cannot think that the rule laid down in Pennock v. Dialogue and Kendall v. Winsor was intended to be qualified by the remarks of Mr. Justice Clifford in Bates v. Coe, 98 U. S. 31, 46, 25 L. Ed. 68, or Parks v. Booth, 102 U. S. 96, 105, 26 L. Ed. 54. We are confirmed in this by the reference made in Bates v. Coe, 98 U. S. 46, 25 L. Ed. 68, to the decision in Pennock v. Dialogue and to the effect of the legislation enacted since, and particularly by the view expressed by the same justice while sitting on the circuit in Jones v. Sewall, 3 Cliff. 563,

---

[1] It should be noted, moreover, that the views pointed out in the foregoing decisions are in accord with expressions of Mr. Justice Bradley in Elizabeth v. Pavement Co., supra, at page 137 of 97 U. S., 24 L. Ed. 1000, of Mr. Justice Strong in Planing Machine Co. v. Keith, 101 U. S. 479, 485, 25 L. Ed. 939, of Mr. Justice Matthews in Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, 256, 8 Sup. Ct. 122, 31 L. Ed. 141, and of Mr. Justice Blatchford in his approval of these two decisions in Root v. Third Ave. Railroad, 146 U. S. 210, 224, 225, 13 Sup. Ct. 100, 36 L. Ed. 946.

592, 593, Fed. Cas. No. 7,495, where, in distinguishing between the intent to be inferred from experimental practice of an invention and practice for gain, he said:

"Such an inference (of intention to surrender the invention to the public) is never favored, nor will it in general be sufficient to prove such a defense, unless it appears that the use, exercise, or practice of the invention was somewhat extensive, and for the purpose of gain, evincing an intent on the part of the inventor to secure the exclusive benefits of his invention without applying for the protection of letters patent. Curtis on P. (3d Ed.) § 389."

We may add that the rule of diligence laid down in Pennock v. Dialogue and Kendall v. Winsor finds support through analogy deducible from provisions of the patent laws other than the language considered in those decisions. Diligence in applying for the reissue of defective patents, for instance, is recognized as one of the conditions inhering in the power bestowed in that behalf, although the statute is silent as to time. Mahn v. Harwood, 112 U. S. 354, 357, 359, 360, 5 Sup. Ct. 174, 6 Sup. Ct. 451, 28 L. Ed. 665; Miller v. Brass Co., 104 U. S. 350, 352, 26 L. Ed. 783; Wollensak v. Reiher, 115 U. S. 87, 101, 5 Sup. Ct. 1132, 29 L. Ed. 355; Topliff v. Topliff, 145 U. S. 156, 171, 12 Sup Ct. 825, 36 L. Ed. 658; Wollensak v. Sargent, 151 U. S. 221, 228, 14 Sup. Ct. 291, 38 L. Ed. 137. Again, diligence in reducing an invention to practice is of the essence of the right to treat the date of the invention as relating back to its conception. Twentieth Century Machinery Co. v. Loew Mfg. Co., 243 Fed. 373, 384, 385, and citations (C. C. A. 6). Why should not the same considerations that exact diligence in such instances as these be controlling also in respect of applications for patents?

As already stated, however, counsel insist that this course of reasoning is opposed to the language of the patent laws; and special reliance is placed on the rule declared in Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, Ann. Cas. 1913D, 880. That case has been overruled since the submission of the instant case (Motion Picture Co. v. Universal Film Co., 243 U. S. 502, 518, 37 Sup. Ct. 416, 61 L. Ed. 871); and it is to be observed that, in overruling Henry v. Dick Co., stress was laid on the fact that the statutes relating to patents do not authorize patentees to impose conditions upon the use of patented machines when once sold. By analogy it is not too much to say (in addition to what we have already said on the subject) that the absence of express statutory limitation as to the time within which an application for a patent may be filed cannot be regarded as entitling an inventor himself to fix such time in respect of a perfected invention, subject only to the rights of another inventor who may meanwhile have acquired a patent upon a like invention.

It is said that exaction of diligence in a case like this is opposed to the rule of the Paper Bag Case, 210 U. S. 405, 28 Sup. Ct. 748, 52 L. Ed. 1122, allowing a patentee to hold his patented invention in nonuse. So far as that case is claimed to concern the present controversy, it deals with the right of the holder of a validly issued patent to refrain

both from using and permitting others to use the invention. We are dealing with a patent whose validity is in contest, and with the right secretly to use a perfected invention indefinitely and for profit and then secure a patent. Under the patent laws the right of a patentee and the right of an inventor are of course not the same. A patent, as we have seen, vests in its holder the right to exclude others from using the invention; but a mere invention gives no such right. United States v. Bell Telephone Co., 167 U. S. 224, 238, 17 Sup. Ct. 809, 42 L. Ed. 144; Dable Grain Shovel Co. v. Flint, 137 U. S. 41, 43, 11 Sup. Ct. 8, 34 L. Ed. 618. However, as before pointed out, under the patent laws an inventor has an inchoate right to obtain a patent. A patentee then who holds his invention in nonuse is at least in the exercise of an absolute right to exclude others, while an inventor who simply for his secret use and advantage withholds a perfected invention is neglecting, indeed declining, to exercise his inchoate right to secure a patent; the patentee moreover unites his original right in the discovery with the exclusive right he receives under the patent, but the inventor rejects this course and resorts to one of his own until it fails him. The ultimate difference between the two courses is that the patentee at most receives the benefit of his monopoly only for the prescribed statutory period, but the inventor would upon approval of his course inevitably transgress the limits of that period and this too without the slightest sanction, but in abuse, of the patent laws. The Paper Bag decision therefore is plainly inapplicable.

[4] We are thus led to conclude that whatever view may be taken of the conditions existing at the time the patent in suit was applied for, the invention had been abandoned.

Accordingly, upon this ground the decree will be affirmed.