22 C. C. P. A. (Patents)

## STRESAU v. IPSEN.
### Patent Appeal No. 3484.

Court of Customs and Patent Appeals.
June 10, 1935.

Elwin A. Andrus, of Milwaukee, Wis. (George I. Haight, of Chicago, Ill., of counsel), for appellant.

Harry E. Dunham, of Schenectady, N. Y. (Fairfax Bayard, of Schenectady, N. Y., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

This appeal involves an interference proceeding originating in the United States Patent Office between a patent, No. 1,771,-961, issued to Ipsen July 29, 1930, upon an application, serial No. 312,760, filed October 16, 1928, and an application, serial No. 339,200, filed by Stresau February 11, 1929.

The subject-matter is embraced in four counts comprising four method claims copied into the Stresau application from the Ipsen patent for the purpose of inter-

ference. The issues involved do not necessitate an analysis of the counts, all of which relate to a method of electric arc welding, particularly the welding of heavy metal parts, as will appear from an examination of claim 1 which reads: "1. The method of electric arc welding heavy metal parts which includes grooving the parts at the joint to produce abutting edge portions of such thickness that a light weld will not fully penetrate the same, uniting said parts along said edge portions on the side of the parts opposite the groove by a light backing-up weld and then uniting the parts on their opposite side along the length of the groove by a weld formed by fusing the walls of the groove and filling the groove with molten metal."

The patent to Ipsen shows that it was assigned to his employer, General Electric Company, a corporation of New York, and the declaration of interference so states. It is set forth in the briefs and was stated in the oral arguments of both counsel before us that the application of Stresau is the property of the A. O. Smith Corporation (hereinafter referred to as the Smith Company) of Milwaukee, Wis. For convenience, we shall most frequently designate the parties by the names of the inventors—Stresau and Ipsen, or as appellant and appellee.

The appeal to us is from the decision of the Board of Appeals, affirming the decision of the Examiner of Interferences, awarding priority to Ipsen.

It is conceded that Stresau conceived and reduced to practice at a period antedating the conception of Ipsen, and the contention of Ipsen is that there was deliberate and willful concealment of the Stresau invention, so as to make applicable the doctrine of equitable estoppel enunciated in different cases by different courts, the case of Mason v. Hepburn, 13 App. D. C. 86, being the leading and most frequently quoted authority.

That the issue may be clearly understood, it is proper to emphasize, as did the board, that Ipsen does not urge either abandonment in fact, or suppression in fact, of the invention. The allegation is that of concealment, after reduction to practice, in a manner which deprives Stresau of legal right to patent. In other words, it is insisted that Stresau, by his acts, abandoned his legal right to patent for the process, under the facts hereinafter detailed.

The interference sought by Stresau was declared December 4, 1930, with the requirement that preliminary statements should be filed by January 5, 1931.

In his preliminary statement, Stresau claimed conception and disclosure to others about the first week in June, 1925, and reduction to practice about July 1, 1925. Ipsen claimed all of these "in the spring of 1928."

Since the Stresau application was pending at the time of the issuance of the Ipsen patent, Stresau had merely the burden of establishing priority by a preponderance of the evidence. Sachs v. Wadsworth, 48 F.(2d) 928, 18 C. C. P. A. (Patents) 1284.

From the record before us, it does not appear that after the filing of the preliminary statements any further action of any character was taken in the case until October 31, 1932, when the taking of testimony on behalf of Stresau began.

The testimony of Stresau himself, who was a consulting engineer of the Smith Company in charge of its weldrod and welding development work, was not then available, he having died in January, 1932. On behalf of the application filed in his name, the testimony of three witnesses was taken, all of whom, at the time their testimony was given, were employees of the Smith Company at its welding plant in Milwaukee. The first of these witnesses was William T. Graham, who, during the time that is of importance here, was superintendent of the shop in which were produced heavy walled, or pressure, vessels, such as stills for use in oil refining, pipe mills, and the like. The second was Harold O. Pollei, a welding supervisor, who had to do with the welding of the pressure vessels. The third was Sylvester V. Williams, who became an employee of the Smith Company August 1, 1928, but who, for about two years prior to that time, had been stationed in the plant as an inspector for companies for whom the Smith Company was constructing oil stills.

On behalf of Ipsen there was presented the testimony of Ipsen himself, together with that of Leslie C. Byer, John E. Waugh, and Vernon N. Buys, all of whom were in the employ of General Electric Company.

Numerous exhibits of a documentary character were placed in evidence by both parties.

In neither decision of the tribunals of the Patent Office do we find any specific date awarded Ipsen for reduction to practice. The Examiner found that he conceived "at least prior to June, 1928, when it [Ipsen's method] was employed at the plant of the Walsh Holyoke Steam Boiler Works." As the issue is here presented, his specific date of reduction to practice is immaterial, and it may be assumed that it occurred with the use of his process in June, 1928, by the company named.

The finding as to reduction to practice of the Stresau invention is that it occurred "at least as early as September, 1926," in the plant of the Smith Company.

Not only is this finding *not* contested upon the part of Ipsen, but it is most earnestly insisted, being more than once stated in the Ipsen brief, that Stresau is bound by the averment of his preliminary statement that he conceived, disclosed, and reduced to practice in June, 1925.

This contention is made because of the possible bearing which length of time may have respecting the alleged concealment of the Stresau invention. It is, in effect, argued by counsel representing the Ipsen side of the controversy that, under the facts of the case, upon the theory of concealment, Stresau's averment is an admission against interest.

Counsel for both parties have urged their views before the court with somewhat extraordinary earnestness, and, so far as argument is concerned, no phase of the issue seems to have been overlooked. Each side has urged deductions from such facts as have been shown, some of which deductions we feel may be drawn only by somewhat strained constructions of events and circumstances proven. We are asked to make some deductions as to facts which well might have been proven as facts if they really existed.

Without setting forth the evidence in detail, we state our conclusions as to what actual relevant facts have been proven.

Stresau's reduction to practice was at least as early as September, 1926, when the process was used in welding. The results then obtained, however, were not sufficiently satisfactory to cause the adoption of the method as standard practice by the Smith Company until early in 1927, the weight of the evidence indicating that it was in March or April, 1927. After being so adopted, it was continuously and regularly used, at least up until the filing of the Stresau application in February, 1929, and it was used secretly in the sense that it was not disclosed to the public. Only Williams, representing customers as inspector, and certain employees of the Smith Company—perhaps from 30 to 40—who were engaged in the welding work had full opportunity to learn the process. The employees were under contract not to divulge any of the secret processes or "trade secrets" of the Smith Company to the public, and Williams, while not bound by contract during the time he was representing customers, nevertheless held himself so obligated by professional ethics. After becoming an employee of the Smith Company in August, 1928, he became bound by contract as were the other employees. This contract was broad and comprehensive, embracing all secret processes and trade secrets, including the process at issue.

Visitors were admitted to the Smith Company plant only by permission of certain high officials who personally conducted those admitted through the plant, and there is no evidence that any visitor was ever informed as to the Stresau process.

We think it clear from the evidence that the policy of secrecy in the manner above described was a general policy of the Smith Company and there need be no further recitation at this point of what the record shows concerning it.

Appellee, Ipsen, after the reduction of his process to practice, gave it to the public, even before the filing of his application for patent thereon. He testifies that it was put into commercial use at the plant of the Walsh Holyoke Steam Boiler Works in June, 1928. Nothing is said of this use having been a secret one, and Ipsen's testimony is to the effect that wide publicity was given his process by the welding specialists, or salesmen, of General Electric Company, to many of whom it was fully described in letters, accompanied by samples, the letters bearing date of August 1, 1928. It is stated that there were 15 of these specialists, or salesmen, located at General Electric Company's principal sales offices. The particular offices named were Boston, New York, Philadelphia, Pittsburg, Cleveland, Chicago, San Francisco, and Los Angeles. It was the business of the salesmen to visit and deal with the "welding customers" of General Electric Company, and Ipsen says they specialized "on welding equipment." The fair deduction is that they made Ipsen's process known to

940

such customers, but there is nothing to show that any salesmen ever called upon Stresau or his assignee.

In the fall of 1928, beginning October 19, 1928, and continuing to February 9, 1929, General Electric Company caused to be sent to various persons and companies, situated in a large number of states, a revised edition of its pamphlet or book entitled, "Arc Welding Manual," in which there was included a description of the process at issue. A list of those to whom the publication was sent is included in the record, together with the number of copies sent to each and the dates on which they were sent. In all, according to the testimony of Buys, there were distributed 2,409 copies prior to February 11, 1929, the date on which the Stresau application was filed.

It may be added that the manual was copyrighted, and it is stipulated that copies of it were received in the "Copyright Office of the United States of America, Library of Congress, Washington, D. C., on November 9, 1928."

In the aforementioned list is a record of 25 copies sent to Milwaukee, Wis., December 21, 1928. The list itself does not reveal to whom these were sent, but elsewhere in the record it appears that they were sent to a branch or sales office which General Electric Company had in Milwaukee. There is no disclosure of what became of them after being so sent.

The foregoing facts are entirely sufficient to show that the Ipsen process was quite promptly given to the public following its development by him, and it is insisted on behalf of his application that they serve another purpose as well, viz., to show a condition from which it may properly be deduced that Stresau, or the Smith Company, was spurred into activity by receiving knowledge of the Ipsen process, and that the Stresau application was filed under such spur.

Any holding to this effect must necessarily be based solely upon inference. There is no evidence that Stresau himself ever saw or heard of either the letters of the manual. According to the testimony of Ipsen's witness, Buys, a copy of the manual was sent to the A. O. Smith Corporation on March 7, 1929. This was nearly a month after the filing date of the Stresau application.

During the cross-examination of appellant's witness, Graham, he was shown one of the manuals containing the description of Ipsen's process, and in answer to a question, said, "I don't remember seeing a copy of this particular manual." Upon being further cross-questioned, he stated, in substance, that he had seen one or more arc welding manuals published by General Electric Company, chiefly in the still shop where he was employed, they being there used in teaching welders, and that he saw them "During '26, 7 and 8" while they were "breaking in" many welders.

He was then asked to look in the library of the Smith Company to see whether any copies of Arc Welding Manuals of the General Electric Company were there and, if so, to produce them when he returned to the stand.

The notary was then requested to mark the pages of the manual which was being used containing the description of Ipsen's process. This was done, but no questions directly relating to the description were then or subsequently asked that witness or any other witness for Stresau.

Upon the resumption of Graham's cross-examination the following day, he produced two General Electric Company manuals, one copyrighted in 1928 and one in 1929. The subsequent examination was confined to the 1928 edition, and the witness testified that he procured it from the office of the Smith Company's patent attorney; that it properly belonged in the Smith Company's library; that any book might be withdrawn from the library by any member of the company's organization, and that the records held in the library by the librarian and the records of the company's purchasing department disclosed that the Smith Company acquired the copy of the 1928 edition on March 20, 1929. This date, like the date of the shipment to the Smith Company by General Electric Company above alluded to, was several weeks after Stresau's filing date.

Thereafter the witness testified that, in response to a request made by appellee's counsel, he had examined the numbers listed upon a library card to show by whom a book was withdrawn, and that the numbers upon the card relating to the manual did "not refer to any person or persons connected with the Patent Department or to Mr. Richard Stresau." It was not shown to whom they did relate.

Upon redirect examination, the attention of the witness was called to his testimony respecting having seen arc welding publications "During '26, 7 and 8" and he

was asked: " * * * Do you recall at this time having seen any arc welding publications of the General Electric Company in the Still Shop in those years?"

The witness answered: "A. During that period probably all the manuals written around arc welding were brought to my attention by various members of the A. O. Smith welding organization in the Still Shop and amongst them were certain manuals and bulletins published by the General Electric Company and others interested in the art, although I can't off-hand recall having seen any specific books or pamphlets."

Appellant's witness, Pollei, on cross-examination, testified that he had never seen any book entitled, "Arc Welding Manual," published by the General Electric Company prior to the day before his testimony was taken, when he saw the copy of the 1928 edition heretofore alluded to. Williams, upon cross-examination, testified that he had never seen one until one was shown him while testifying, and that he did not recall "ever hearing a discussion on the Arc-Welding Manual of G. E."

The foregoing comprises the substance of all the testimony relied upon by appellee to support an inference respecting Stresau, or the Smith Company, receiving knowledge of the Ipsen process prior to Stresau's filing date and being incited to activity thereby.

As we interpret the decisions of the tribunals of the Patent Office, they are not in entire agreement upon one question of law.

The Examiner of Interferences cited many authorities upon different specific points discussed by him, among them being Macbeth-Evans Glass Co. v. General Electric Co. (C. C. A.) 246 F. 695, and Kendall et al. v. Winsor, 21 How. (62 U. S.) 322, 16 L. Ed. 165. In the course of his decision he said: " * * * Unless it is found that Stresau had knowledge of Ipsen's invention, it is believed that the period of said [Stresau's] delay is not sufficient to establish that Stresau had elected to pursue the path of secret use of his invention in abandonment of his right to obtain a patent under the doctrine of Macbeth-Evans Glass Co. v. General Electric Co., supra, and Kendall v. Winsor, supra. * * *"

Elsewhere, however, the Examiner of Interferences said: "It is believed * * * that Ipsen made a prima facie showing that

Stresau, or a responsible employee of his assignee, had knowledge of the Ipsen invention prior to the time Stresau's application was filed. * * * It is not believed unreasonable to assume that at least one of these persons became aware of Ipsen's invention prior to Stresau's filing date."

It was added, in substance, that this did not necessarily mean that Stresau, or his assignee, was charged with knowledge, but that the facts shown placed "a positive duty" upon whoever was responsible for filing the Stresau application to prove that it was "caused * * * to be filed without * * * any knowledge of the Ipsen invention."

Apparently, the Board of Appeals, although it concurred with the Examiner of Interferences respecting the knowledge attributable to Stresau, or his assignee, prior to Stresau's filing, did not regard that as being of the importance which the Examiner of Interferences attached to it, because the board said: "Independent of his [the Examiner of Interferences] holding of a stirring into activity by Stresau, we feel that Stresau concealed his invention after reduction to practice for something over two and a half years before filing his application and that such concealment brings this case within the doctrine of Mason v. Hepburn."

However, in the same paragraph in which the foregoing appears, the board, after citing and quoting from the decision in the case of Dieckmann v. Brune, 37 App. D. C. 399, said: " * * * Stresau made no effort to bring his process before the public in any manner until stirred into activity by another's work."

In the several briefs filed before us, counsel for the respective parties have marshaled a large number of cases believed by them to bear upon the main issue and questions ancillary thereto. An examination of these cases leads to the belief that, taken together, they embrace substantially all material judicial constructions of the patent law relating to abandonment, suppression, concealment, and incitation to activity, or "spurring" into activity; some also embrace discussions of the question of "abandoned experiment," with which we are not here concerned.

In many instances the cited cases embrace matter bearing upon more than one of the questions here presented for determination.

Ancillary to, or as bearing upon the principal issue—that of concealment—two questions are presented:

(a) That of Stresau's alleged admission against interest in the date for reduction to practice set out in his preliminary statement. Upon this point, appellee cites Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc. (C. C. A.) 32 F.(2d) 195, and Zinc Co. v. Singmaster, 17 U. S. Pat. Q. 204.

(b) That of Stresau, or his assignee, being incited to activity by the alleged receipt of knowledge of the Ipsen process. Various authorities cited by both parties, and hereinafter set forth in our discussion of the principal issue, relate to this. In discussing this question, the contention is made by appellee that, after the disclosures in the testimony of the several witnesses of the respective parties, it became incumbent upon appellant to show that no such knowledge was received, and there are cited, as bearing upon the deduction which it is insisted should be drawn from appellant's failure to present evidence upon this point, the cases of Kirby v. Tallmadge, 160 U. S. 379, 383, 16 S. Ct. 349, 40 L. Ed. 463; Gulf, C. & S. F. Ry. Co. v. Ellis (C. C. A.) 54 F. 481; Cooper v. Hubbell, 53 F.(2d) 1072, 19 C. C. P. A. (Patents) 790; Philadelphia Storage Battery Co. v. Kelley-How-Thomson Co. (C. C. A.) 64 F.(2d) 834, 839; Dreckschmidt v. Schaefer, 46 App. D. C. 295; also 22 Corpus Juris 115 (§ 56).

Upon these questions which we have designated as ancillary to the main isue; we hold:

First, as to (a). Under the facts of this case we attach no importance to the date claimed by Stresau in his preliminary statement for reduction to practice.

What Stresau may have done independent of what was done in the Smith Company plant by way of reducing to practice is not known. He was dead at the time of the taking of testimony. So far as lay within the knowledge of the witnesses who were examined, there was no reduction to practice until 1926, and we can find nothing of record which would justify attributing to such witnesses any motive for attempting to establish a date later than the actual date. It is difficult to determine from the record just when appellant was placed upon notice that concealment was to be relied upon by appellee. The first intimation of it certainly did not appear until during the cross-examination of Graham in the fall of 1932, when he was asked with reference to having seen the 1928 edition of General Electric Company's Welding Manual. It is possible, although not conclusive, that by these questions, counsel for Stresau might have been put upon notice. It is certain, in any event, that upon the record, no date earlier than the 1926 date could be awarded Stresau for reduction to practice. We therefore do not regard it as proper to consider the period from July, 1925 (the date alleged in Stresau's preliminary statement), to September, 1926, in connection with the question of concealment. This view, as we understand it, accords with the view of the tribunals of the Patent Office.

■ Second, as to (b). Incitation to activity, or being "spurred into activity," is a factor to be considered in cases such as this for whatever aid it may give in determining the intent of the party alleged to have concealed.

The only relevant incitation is that which results from actually learning that a rival is in the field. Mere apprehension that some one else might evolve the invention would not, of course, affect the question.

■ Such knowledge must, therefore, be brought home to one against whom concealment is alleged, and the burden rests upon the alleging party to show that such knowledge was within the possession of the other party, or, at least, to show a state of facts from which possession of knowledge and consequent activity are the reasonable and natural inferences. However, it is not required that such showing be made beyond a reasonable doubt as the brief on behalf of appellant seems to contend.

■ It is our conclusion that appellee failed to make the requisite proof upon this point in the instant case.

Assuming, without holding, that knowledge upon the part of Graham who was, so far as the record shows, only an employee of the Smith Company and a coemployee of Stresau, would have been sufficient to charge the company and Stresau, one or both, with knowledge, we are not satisfied to hold, upon this record, that Graham was possessed of such knowledge. The substance of the evidence has been given above, and there is no need of here repeating it.

Furthermore, we do not think appellee established a state of facts which required rebuttal or denial (if such could have been made) on the part of appellant.

Graham was never asked whether he, at any time, saw and read the pages of the book shown him upon which Ipsen's process was disclosed. He was merely interrogated as to whether he had seen the book. As to this, he was not certain, but, assuming that he saw the book, which we conclude consisted of many pages (since the part which counsel had marked appeared on pages 144 and 145), it is asking much of the court to request it to presume that he saw the indicated pages. Appellee's counsel did not go far enough in cross-examination, or otherwise, to necessitate testimony on the part of Graham or others with respect to knowledge of the specific disclosure involved.

We are not unmindful of what was said by the Court of Appeals of the District of Columbia, our predecessor in patent jurisdiction, in the case of Dreckschmidt v. Schaefer et al., supra, where comment was made upon the failure of Dreckschmidt to offer testimony in refutation of the implication that he had knowledge of the activities of Schaefer et al., although it did not appear that he had gained information of the manufacturer or had seen a certain circular describing the latter's patent. The opinion of the court in that case does not disclose the full record before it, and we have no means of determining just how strong a prima facie showing was there made by the appellees. The applicability of any legal principle necessarily depends upon the facts of the case in which its application is sought.

Finally, the ultimate issue may be stated in the form of a question.

■ Did the conduct of Stresau, concededly the first inventor in fact, or his assignee, in secretly using his process as a commercial process, for profit, during most of the period from its reduction to practice in, say, September, 1926, until the filing of the application in February, 1929, concealing all knowledge of it and its use from the public, in the manner which has been described, amount to a forfeiture in law of his right to a patent, Ipsen, during that period, having developed the process independently, having made it public, and having applied for the patent subsequently granted him, it being assumed that neither Stresau, nor his assignee, was incited to file application by receiving information of Ipsen's work?

In other words, does the state of facts presented justify and require the application of the doctrine of equitable estoppel (or, as expressed by the Supreme Court of the United States in Consolidated Fruit Jar Co. v. Wright, 94 U. S. 92, 96, 24 L. Ed. 68, "A principle akin to the doctrine of equitable estoppel") applied in Mason v. Hepburn, supra?

Appellee contends that such is the law, saying: Even if Spurring Into Filing by Knowledge of the Ipsen Invention Were Not Proved, Stresau Would Be Estopped.

In support of this contention, quotations are given in the brief from the cases of Mason v. Hepburn, supra; Howard v. Bowes, 31 App. D. C. 619; Hambuechen v. Schorger, 56 App. D. C. 141, 10 F.(2d) 1006; Seppmann v. Roden et al., 46 F.(2d) 186, 188, 18 C. C. P. A. (Patents) 831; and Miller v. Hayman, 46 F.(2d) 188, 18 C. C. P. A. (Patents) 848.

A careful examination of the cases so cited discloses that in each of them the factor of incitation to activity was, in fact, found to be present, although the decisions in some of the cases did not specify this as an element influencing the court in the conclusion reached. An example of this is the case of Seppmann v. Roden et al., supra. Attention may here be directed to the fact that the word "concealment" does not appear in the text of that opinion, although it is used in one of the headnotes.

■ The first inventor, in fact, is presumed to be the first inventor in law; the patent statutes contemplate that the first inventor of a patentable device or process shall receive patent therefor, and, generally speaking, his right thereto may not be defeated by a subsequent inventor, or by the public, unless an abandonment of the right on the part of such first inventor be shown. Rolfe v. Hoffman, 26 App. D. C. 336, 344; Hubbard v. Berg, 40 App. D. C. 577; Townsend v. Smith, 36 F.(2d) 292, 294, 17 C. C. P. A. (Patents) 647, with their appropriate citations.

In the case of Seppmann v. Roden, supra, in stating one of the grounds upon which our decision rested, it was said: " * * * the evidence is inconsistent with any conclusion other than that he [Roden] deliberately and willfully postponed his claims to a patent and withheld his invention from the public for the purpose of se-

curing an advantage not warranted by the patent laws."

█ We think the rule there implied is applicable here, where concealment, rather than abandonment, as "abandonment" is commonly used in constructions of the patent laws, is relied upon by appellee, and the burden rests upon appellee here to show a state of facts from which the natural and reasonable conclusion is that appellant intended to postpone his claims to a patent for the purpose of securing an advantage not warranted by the patent laws. Concealment will not be presumed, and the doctrine of equitable estoppel is not favored.

Certain of the other cases already cited herein support the foregoing principles, and, in addition, there may be cited the cases of Thomson v. Weston, 19 App. D. C. 373; Richards v. Burkholder, 29 App. D. C. 485; Brown v. Campbell, 41 App. D. C. 499; MacLaren v. Stoetzel, 38 F.(2d) 125, 17 C. C. P. A. (Patents) 857; Harlan v. Bregman et al., 39 F.(2d) 494, 17 C. C. P. A. (Patents) 949; Nystrom and Landwehr v. Mancuso, 64 F.(2d) 698, 20 C. C. P. A. (Patents) 934; Severson v. Olson, 64 F.(2d) 694, 697, 20 C. C. P. A. (Patents) 946; Rhinevault v. Pfiester, 65 F. (2d) 161, 20 C. C. P. A. (Patents) 1112; Knoop v. Woodward, 69 F.(2d) 558, 21 C. C. P. A. (Patents) 965; Brogden and Trowbridge v. Henry, 69 F.(2d) 978, 21 C. C. P. A. (Patents) 1043; Osgood v. Ridderstrom, 71 F.(2d) 191, 21 C. C. P. A. (Patents) 1176; Altorfer v. Haag, 74 F. (2d) 135, 22 C. C. P. A. (Patents) ——; Ronning Machinery Co. v. Winsor, 76 F. (2d) 392, 22 C. C. P. A. (Patents) ——.

Much emphasis has been placed upon the case of Macbeth-Evans Glass Co. v. General Electric Co., supra.

We do not regard the principle, or principles, upon which the decision in the Macbeth-Evans Glass Co. Case, supra, rested as being applicable here. Macbeth developed a formula and process for making illuminating glass some time prior to the fall of 1903. In the fall of that year the company of which Macbeth was president commenced use of the formula and process "as secret inventions for making illuminating glass" and continued this use without making application for patent until May 9, 1913, a period of almost 10 years. It received a patent and the suit in which the decision referred to was rendered was an infringement proceeding brought against General Electric Company.

It appears from the opinion in the case that in 1910 a company (not involved in the infringement suit) learned the secret process from a retired employee of the Macbeth Company and began to use it, and that the Macbeth Company, still without applying for patent, successfully prosecuted (in the state courts of Pennsylvania) an action to enjoin its use.

Without reviewing the opinion in detail, it seems sufficient to say that the United States Circuit Court of Appeals held, in effect, that, from the facts appearing, Macbeth's conduct was of a character which led irresistibly to the conclusion that he had elected to pursue the secret use of his process and had "repudiated" the right to secure protection of the patent laws. Upon the facts of that case, it would require much temerity to question the soundness of the court's opinion or the correctness of its conclusion. Macbeth's intention was overwhelmingly demonstrated by his actions.

But we do not have here an analogous state of facts. It is true that it is made to appear in the record that the Smith Company had a general policy of preserving "trade secrets," including unpatented processes, and that it had engaged in litigation for their protection, but the litigation referred to is not shown to have involved the process at issue.

It may be said, incidentally, that the protection of trade secrets has the sanction of law, and we have never heard it suggested that in the practice itself there is aught of moral turpitude. Vide 15 US CA § 46; 18 USCA § 216; section 335, Tariff Act of 1930 (19 USCA § 1335).

We have not heretofore had before us any case in which the issue involved was on all fours with the case at bar, nor do we find any such case among the decisions of our predecessor in patent jurisdiction, the Court of Appeals of the District of Columbia.

In the case of Seppmann v. Roden, supra, there was a period of almost 5 years between Seppman's claimed reduction to practice and the filing of his application, and it was almost 2 years after the issuance of Roden's patent before Seppman filed. Seppman's device was never used commercially during the period mentioned.

In the case of Miller v. Hayman, supra, actual concealment and suppression of Miller's device, without use of any kind, for a period of almost 10 years was found, and also it was found that Miller's employer, the actual party in interest, received knowledge of Hayman's device before the filing of the Miller application, and was incited to file by such knowledge.

See, also, Severson v. Olson, supra; Rhinevault v. Pfiester, supra; Knoop v. Woodward, supra; Altorfer v. Haag, supra.

In the case at bar, while there was a period of about 2½ years between the reduction to practice of the Stresau method and the filing of the Stresau application, the continuous use of it as standard practice was for less than 2 years of that period, and we do not feel that such use was accompanied by acts from which it would be just to conclude that Stresau, or his assignee, had elected to abandon the legal right to patent, as, in effect, is argued by counsel for appellee.

In the Macbeth-Evans Glass Co. Case, supra, the court discussed the question of diligence *after* reduction to practice, citing authorities, and concluded that, upon the facts there presented, Macbeth had been so lacking in diligence that he was estopped, this being an additional, but stated to be a somewhat related, ground upon which the decision was based. The decision did not, however, even suggest that the rule with respect to diligence in filing *after* reduction to practice should be the same as that which applies *in* reducing to practice following conception. That there is a difference is so well known that no citation of authorities is deemed necessary.

We fully appreciate the fact that the ultimate and fundamental purpose of the constitutional provision for the grant of patents, and of all the laws relating thereto, is the public benefit. Paragraph 8, § 8, article 1 of the Constitution is the only one of the grants of power to Congress which may be said to state within itself the reason for the grant, viz., "To promote the Progress of Science and useful Arts."

The Congress, however, never has deemed it proper to fix by statute a time within which, after reduction to practice, an application must be filed, and, as has been indicated above, the spirit of the patent law favors the first inventor in fact. All courts have consistently so held, and always the first inventor has been given the award unless by his own conduct, or that of his privies, his right has been found to be forfeited.

The Board of Appeals says: "We have carefully reviewed the recent decisions of the Court of Customs and Patent Appeals as indicated above and although we appreciate the Court is hesitant to extend the doctrine of Mason v. Hepburn much beyond the circumstances presented in that particular case, yet we feel that the Court does not intend to require in every case evidence of the same state of facts as presented in that decision before applying the Mason v. Hepburn doctrine."

The board, of course, is correct in the assumption that it was not our intention "to require in every case evidence of the *same* state of facts" (italics ours) as was presented in the Mason v. Hepburn Case, supra, before applying its doctrine, but it is our opinion that the showing of facts must be such as to make the case against the party charged with concealment at least as strong as was the showing of abandonment and suppression on the part of Mason in that case. In the case of Severson v. Olson, supra, this matter was discussed at length and we there took pains to say: "Whether or not the first inventor has placed himself in such an inequitable position as to justify the application of the doctrine [of equitable estoppel] must be determined from the particular facts of his case."

It was also said there: "Only where such gross inequities clearly threaten to defeat the spirit and the purposes of the patent laws must it [the doctrine of estoppel] be given controlling effect."

Other parts of our discussion in that case we think will be found pertinent here.

The decision of the Board of Appeals is reversed.

Reversed.