## MILLER v. HAYMAN.
### Patent Appeal No. 2534.

Court of Customs and Patent Appeals.
Jan. 12, 1931.

The invention involved is an interlocking seam for stovepipes. The issue is in two counts, which read as follows:

"1. A lock of the character described comprising a tubular structure doubled upon itself to form three thicknesses of material, two of which are on the axis side of the tube, the innermost thickness of the doubled portion having a raw and a folded edge, a cut in said portion between said edges forming a raw locking edge, said tubular structure having a cooperating edge portion adapted to lie and be enclosed between the doubled thicknesses so that the innermost thicknesses of the doubled portion lies in the axis side of the cooperating edge portion, and an offset lock in said edge portion projecting toward the tubular axis, said lock engaging the raw locking edge and preventing separation of the parts.

"2. A lock of the character described comprising a closed sheet metal structure, one edge portion of said sheet being doubled back and forth on itself to form three thicknesses of material, two of which are on the inside of the structure, a lock between the edges of the innermost fold, said structure having a cooperating edge portion adapted to lie and be enclosed between the doubled thicknesses, a lock in the cooperating edge portion projecting toward the inside of the structure, said lock being adapted to engage the first mentioned lock to prevent separation of the structure edge portions."

Appellee, the senior party, filed his application on February 15, 1927. Appellee took no testimony, but it was stipulated by the parties that, for the purposes of this interference, in deciding priority of invention, the Examiner of Interferences might accept as proven the dates set up in appellee's preliminary statement. By reference to said preliminary statement, therefore, appellee was entitled to conception as of March 1, 1926, and reduction to practice as of July 1, 1926, and said dates were accorded to him by the Examiner and by the Board of Appeals.

Appellant filed his application on April 5, 1927, and introduced testimony in his behalf.

The Examiner of Interferences found that appellant was the first to conceive the invention in issue, and also that he had reduced it to practice prior to the entry of appellee into the field; he further held that appellant had suppressed and concealed the invention and was finally spurred into activity upon acquiring knowledge of the activity of

Harry Frease, of Canton, Ohio, for appellant.

Ellis S. Middleton, of New York City, for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This appeal is taken from the decision of the Board of Appeals of the United States Patent Office in an interference proceeding which affirmed the decision of the Examiner of Interferences awarding priority of invention to appellee.

appellee. He thereupon awarded priority of invention to appellee on the authority of Mason v. Hepburn, 13 App. D. C. 86. He further held that, if the tests made by appellant should be regarded as an abandoned experiment, rather than as a reduction to practice, then appellant had not shown such diligence during the critical period as to entitle him to priority.

Upon appeal to the Board of Appeals, the decision of the Examiner was affirmed, the Board affirming the finding of the Examiner that the case came within the doctrine of Mason v. Hepburn, supra.

Thus both the Examiner and the Board concurred in finding that, although appellant had been first to conceive and first to reduce to practice, his conduct with respect to the invention from the time of his reduction to practice until after appellee had entered the field precluded him from being awarded priority. We believe that the findings of the Patent Office tribunals with respect to prior reduction to practice by appellant are justified by the record. Therefore, there is left for consideration the question of the conduct of appellant subsequent to his reduction to practice, and the effect of such conduct on his right to an award of priority of invention.

It is established by the record that appellant conceived and reduced to practice the invention in issue prior to the year 1914. Appellant testified that this occurred in May, 1913, but the earliest corroborating testimony of invention and reduction to practice fixes the time as "prior to 1914."

It appears that appellant was, at the time of his conception of the invention and its reduction to practice, in the employ of the Ohio Stovepipe & Manufacturing Company of New Philadelphia, Ohio; that his brother-in-law, one R. A. Metzger, was the general manager of said company; said Metzger died in 1924, prior to the filing of the applications of the parties in this interference. Appellant testified that he turned his invention over to said Metzger and told him that whatever he did with the pipe he would share in it, and that if there was any expense connected with the pipe, he (appellant) would pay his share of it. Appellant also testified as follows:

"Q. State whether or not you or Mr. Ralph A. Metzger, with your knowledge and consent, did anything to protect this invention of yours prior to the time you instituted the present patent application. A. I talked it over with Mr. Metzger at the time that the joint of pipe was made and Mr. Metzger showed me a copy of the Rules of Practice in the Patent Office, in which there was what was called a caveat mentioned. He told me to read that over. He said, "That is what we ought to do with this," and I told him to go ahead and do whatever he thought best, and I was of the impression that Mr. Metzger had filed this caveat at that time.

"Q. State whether or not you were also under the impression that he had been keeping the so-called caveat alive since that time. A. I was of the impression that he did."

The witness produced a copy of the Rules of Practice referred to, and it was received in evidence. It is dated December 1, 1879, thirty-four years before the date of his invention.

It appears that in the latter part of 1914 the Ohio Stovepipe & Manufacturing Company sold out its business to the Reeves Manufacturing Company, and that appellant and his said brother-in-law Metzger thereupon went into the employ of said last-named company, said Metzger remaining with said company practically continuously to the time of his death in 1924; appellant remained in the employ of said company until about 1917, when he left, returning to its employ six years later, and then remained continuously in its employ to the time of taking the testimony in this proceeding.

There is no testimony that appellant, prior to the spring of 1927, ever personally disclosed his invention to more than two persons, said Metzger and one Snyder, both fellow employees with appellant of the Ohio Stovepipe & Manufacturing Company, and both of whom died before the testimony in this case was taken. The fact that appellant thought a caveat had been filed in the Patent Office, together with his positive testimony when, asked if he had any reasons for not showing it to anyone else, he replied: "Yes, I didn't care to disclose it to just anyone at that time," tends to show that it was appellant's intention to withhold his invention from the public until he secured a patent upon it.

Appellant testified further that he put the section of stovepipe embodying his invention in his basement in 1913, where it remained until 1917, when he took it out and gave it to his brother-in-law Metzger to show to Mr. A. J. Krantz, general manager of the Reeves Manufacturing Company. Said Krantz testified that he saw the pipe in the fall or early winter of 1916 and 1917. Appellant further testified that Metzger returned the pipe to

him with the statement that said Krantz was not interested in the proposition. Appellant was not at that time in the employ of said company, but Metzger was. Appellant then returned the stovepipe to his basement, where it remained until shortly before the taking of testimony herein on October 11, 1927, the same being a period of ten years.

Appellant further testified as follows:

"Q. State also what, if anything, you finally did to apply for a patent on this particular pipe and what led up to your filing of the patent application involved in this interference. A. Mr. Krantz came to me one day and said that he was very desirous of securing a snap lock pipe, a pipe that could be put together without the aid of tools, and I told him I had such a lock that had been shown to him once before. He said I should make a joint of it and bring it to his office. This I did. Mr. Krantz instructed me to immediately make application for a patent on this pipe, which I did.

"Q. State whether or not you told Mr. Krantz at that time that the idea had been protected by a caveat. A. I did.

"Q. You found out afterwards, did you not, that the caveat law had been repealed quite a number of years ago? A. I did.

"Q. State whether or not that information was a surprise to you. A. It was. I still had and still have this copy of the Rules of Practice that was given to me by Mr. Metzger at that time. I was not acquainted with the rules in the Patent Office and thought that this book was still authentic."

Upon cross-examination, the witness testified that the said conversation with Mr. Krantz occurred in March, 1927.

Edward C. Schweitzer, a witness on behalf of appellant, testified that he was, in 1913, an officer of the Ohio Stovepipe & Manufacturing Company; that in that year said Metzger showed him a pipe similar to Exhibit 1, the pipe produced by appellant from his basement and offered in evidence, and that he then examined it. With reference to such examination he testified as follows:

"Q. State whether or not you are sure that you saw a stovepipe like that one at that time. A. Well, I think probably the one circumstance that impressed it on my mind more fully than anything else was the fact that at the time it was shown to me—understand, that is exactly or practically the same pipe that we made, with the exception that this lock was on the outside instead of the inside, and when this pipe was shown to me I wasn't particularly enthusiastic about it, for the reason that I thought this joint, this lock, being down on the first joint next to the stove, or whatever it is, wherever the fire was, that that might burn off or lose its life and allow that joint to come apart there, and that impressed it on my mind probably more than any other thing, the fact that that feature of it was discussed. I couldn't see enough advantage in simply reversing that and have that weakness, which I considered a weakness, exist there, I couldn't see enough advantage. That was unsightly to have it on the outside, but I couldn't see any advantage in changing it. * * *

"Q. Who showed you this pipe, or a pipe like this pipe, Exhibit No. 1? A. Well, I think it was Mr. Metzger. He was in charge of the shop at the time and I think it was Mr. Metzger that showed me the pipe.

"Q. Did he state whether he had any special object in showing it to you then? A. Well, he was of a rather inventive turn of mind and he was always working on anything to improve the product and that was just one of his ideas, I suppose. I don't know whether it was his original idea or not, but he is the one that showed it to me and wanted to know what I thought of it, and that was the objection, I remember very distinctly of bringing that point up at the time.

"Q. State whether or not he wanted you to manufacture a pipe like this, Exhibit No. 1. A. Well, I suppose he had in mind the possibility of doing so, but I never seriously considered it,—at least, I don't remember of ever taking it up later."

A. J. Krantz, the general manager of the Reeves Manufacturing Company, testified that said company was the assignee of appellant's invention in issue. He further testified as follows:

"Q. I will now ask you to look at Miller Exhibit No. 1 and state if you ever saw it before, and, if so, when and under what circumstances you first saw it. A. This piece of pipe?

"Q. Yes. A. Yes, I saw that pipe in the fall or early winter of 1916 and 1917. It was shown to me by Mr. R. A. Metzger, who brought it in to me and asked me if I would be interested in manufacturing that style of pipe, and I told him I would not.

"Q. Did you give him any reasons for your refusal to manufacture this particular style of pipe? A. Yes. I told him we didn't care to manufacture it because it struck me

as being the same pipe that we had been making under what was called the "Smith Improved Double Lock Pipe," and which gave us considerable trouble, and this pipe seemed to me to be the same style of pipe, simply turned wrong side out, and I figured that we didn't care to undertake to make it and sell it.

"Q. Please take this pipe, Miller Exhibit No. 1, and explain somewhat in detail what you mean by stating that this was, in your judgment, at that time, nothing more than the Smith pipe turned inside out. A. Well, the Smith pipe had a double fold and it had an opening through which a button came through and showed on the outside. A slot was formed on one edge and a button on the other and the button engaged the slot. And it struck me, without very much examination, that this new idea that was shown to me was simply the old Smith pipe rolled the opposite way.

"Q. State whether or not your company has ever manufactured any stovepipes like Miller Exhibit No. 1. A. Yes, we have been manufacturing this style of pipe during the present year. I don't know how many joints, but· by this time perhaps several hundred thousand.

"Q. State briefly what led you to take up the manufacture of this style of pipe within the last year, after you had turned it down when this particular pipe was shown you by R. A. Metzger in the fall or winter of 1916 and 1917. A. The reason we started to manufacture this pipe this year was on account of my thinking it necessary to have a style of pipe that could be offered and sold to our trade who might be inclined to buy the new style of pipe brought out by the Parkersburg Iron & Steel Company.

"Q. State what, if any, conversation you had with Donald A. Miller, one of the parties to this interference, about this pipe at the time you decided to manufacture it. A. When we decided we should have another style of· stovepipe I talked with Mr. Miller and asked him what he could suggest, and he said 'Why don't you make the style of stovepipe that Metzger showed you several years ago?' And I said 'Well, suppose you make me up a small sample of it and let me see it again.' Which he did. And at·the time he understood that he had some protection under what he called a caveat, and which I presumed at the time was evidence that there would be no trouble whatever to secure a patent on this particular style of pipe. When he showed me the sample I recalled immedi-

ately having seen the same pipe years before, that shown to me by Mr. Metzger, and decided right then to go ahead and manufacture it and take out applications for patent.

"Q. What was Miller's attitude about this caveat he claimed to have had—or, Metzger claimed to have had? A. Mr. Miller seemed to be very decided in his opinion that there was a caveat on file in Washington protecting his idea, and he showed me copies of the Patent Office Rulings, showing me that the caveat had certain protection and, without knowing anything about the facts, I took it for granted that his statement was absolutely correct."

It is conceded that the pipe manufactured by the Parkersburg Iron & Steel Company was the pipe of appellee's invention, and that said company is the assignee of appellee.

We have detailed the testimony in the record thus at length because of its importance in determining whether in the eyes of the law appellant was the prior inventor of the device here in issue.

Appellant makes two contentions upon which he bases his claim of priority:

1. That the doctrine of estoppel cannot be applied in an interference proceeding, and that the doctrine laid down in Mason v. Hepburn, supra, should be overruled.

2. That the facts in the case at bar do not bring it within the rule declared in the Mason v. Hepburn Case.

We will first dispose of the latter contention. It is clear to us that there was concealment and suppression by appellant of his invention over a period of many years. He kept the model of his invention in his basement from 1913 to 1927, taking it out on only one occasion to be shown by his brother-in-law, Metzger (to whom he gave an interest in the invention), to Metzger's employer for the purpose of interesting him in its manufacture. He testified that he supposed said Metzger had filed a caveat in the Patent Office, and that said Metzger had kept the same alive during his lifetime.

There is no corroboration that the invention was ever disclosed to any one except appellant's employers. It is true that the disclosure of 1917 to the general manager of the Reeves Manufacturing Company was at a time when appellant was not in its employ, but Metzger, who had an interest in the invention, was at that time employed by the company.

From 1917 to 1927, so far as the record discloses, appellant's invention was neglected

and was called to mind only when appellee's invention appeared upon the market. Appellant's employer, spurred into activity by appellee's invention appearing upon the market, through its general manager, discussed the matter of an improved stovepipe with appellant, who recalled to him his early invention and made a new model of it for his inspection. Immediately thereafter, under his employer's direction, appellant filed an application for a patent. Clearly, appellant was spurred into activity by appellee's invention.

We may observe, in passing, that it is a strange circumstance that appellant, in 1913, should rely upon Rules of the Patent Office dated in 1879, containing a law which had been repealed in 1910; but, assuming that he did so rely upon them, it shows that for a period of fourteen years he had in mind that another might make the same invention, and, if they did, he thought that he would receive notice of that fact from the Patent Office, as the law and rules provided in 1879.

We conclude from the foregoing that appellant intended to suppress and keep secret his invention without applying for a patent, and did so, so that the term of his monopoly would begin to run from the time when the invention became profitable to him. Appellant was unwilling to disclose his invention to the public, and he neglected to make application for a patent upon it, but chose to suppress and conceal it because he considered that it would not be to his advantage to have his monopoly, to which he was entitled under the patent laws, begin to run until his invention became profitable to him. Notwithstanding this conduct, unless the same should be held to constitute an abandonment of the invention, he would still have a legal right to receive the protection of the patent laws, unless, during such period of suppression and concealment, another inventor had entered the field and made the same invention. The effect of such subsequent invention upon appellant's right to invoke the protection of the patent laws remains to be considered.

It is urged by appellee that, under the facts in this case as found by the Patent Office tribunals, and by us, the rule laid down in Mason v. Hepburn, supra, should be followed, while appellant, as has already been stated, insists that it should be overruled.

The doctrine declared in that case is that "* * * a subsequent inventor of a new and useful manufacture or improvement who has diligently pursued his labors to the procurement of a patent in good faith and without any knowledge of the preceding discoveries of another, shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as the real inventor and as such entitled to his reward."

The opinion states the ground of the doctrine declared as follows: "The true ground of the doctrine, we apprehend, lies in the policy and spirit of the patent laws and in the nature of the equity that arises in favor of him who gives the public the benefit of the knowledge of his invention, who expends his time, labor, and money in discovering, perfecting, and patenting, in perfect good faith, that which he and all others have been led to believe has never been discovered, by reason of the indifference, supineness, or wilful act of one who may, in fact, have discovered it long before." While the opinion does not expressly so state, we think it clear that the rule there declared rests upon the ground of estoppel. If the principle of estoppel is applicable to an interference proceeding at all, it is clear that in a proper case it may be the determining factor in deciding a question of priority of invention. That is to say, if the conduct of appellant was such, in concealing and suppressing his invention, as to give rise to the application of the doctrine of equitable estoppel, then he cannot be heard to say in such proceeding that he was the first inventor, and any evidence produced by him tending to prove that fact cannot be considered. It would, therefore, necessarily follow that priority must be awarded to appellee.

That the doctrine of equitable estoppel may be applied in proceedings in the Patent Office is well established. Walker on Patents (6th Ed.) § 188 and cases cited.

While the Supreme Court of the United States has never passed upon the precise question involved in Mason v. Hepburn, we think that the principle upon which the rule is founded has repeatedly been invoked by that court in patent cases.

The opinion in Mason v. Hepburn, cites the case of Kendall et al. v. Winsor, 21 How. 322, 327, 16 L. Ed. 165, and quotes extensively from the opinion. That was an infringement case; no rights of a second inventor were involved, but one of the defenses set up was that plaintiff had delayed eight years in applying for a patent after reducing his invention to practice, and that the defendant was entitled to use machines constructed by him embodying plaintiff's invention.

We quote from the opinion in this case as follows:

"It is undeniably true, that the limited and temporary monopoly granted to inventors was never designed for their exclusive profit or advantage; the benefit to the public or community at large was another and doubtless the primary object in granting and securing that monopoly. This was at once the equivalent given by the public for benefits bestowed by the genius and meditations and skill of individuals, and the incentive to further efforts for the same important objects. The true policy and ends of the patent laws enacted under this Government are disclosed in that article of the Constitution, the source of all these laws, viz: 'to promote the progress of science and the useful arts,' contemplating and necessarily implying their extension, and increasing adaptation to the uses of society. (Vide Constitution of the United States, art. 1, sec. 8, clause 9.) By correct induction from these truths, it follows, that the inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote, and, if aided in his design, would impede, the progress of science and the useful arts. And with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefited nor intended to benefit. Hence, if, during such a concealment, an invention similar to or identical with his own should be made and patented, or brought into use without a patent, the latter could not be inhibited nor restricted, upon proof of its identity with a machine previously invented and withheld and concealed by the inventor from the public. The rights and interests, whether of the public or of individuals, can never be made to yield to schemes of selfishness or cupidity; moreover, that which is once given to or is invested in the public, cannot be recalled nor taken from them. * * *

"It is the unquestionable right of every inventor to confer gratuitously the benefits of his ingenuity upon the public, and this he may do either by express declaration or by conduct equally significant with language—such, for instance, as an acquiescence with full knowledge in the use of his invention by others; or he may forfeit his rights as an inventor by a wilful or *negligent postponement* of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced by others. Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these." (Italics ours.)

While it is true that the doctrine of estoppel was not invoked in this case in express terms, it is clear that such conduct of an inventor as would invalidate his patent should prevent him from receiving an award of priority in an interference proceeding, upon the ground that by his conduct he had estopped himself from claiming to be, in the eyes of the law, the first inventor.

If, as the court said in the Kendall v. Winsor Case, supra, an inventor "may forfeit his rights as an inventor by a wilful or negligent postponement of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced by others," it seems clear that among the rights forfeited by the conduct described is the right to claim and prove priority of invention in an interference proceeding.

It must be remembered that patentability of an invention is not involved in an interference proceeding. Whether either party should receive a patent is not for us to determine here. We have to do only with the rights of the parties upon the question of priority of invention, each claiming to be the first inventor under the patent laws. It may be that the effect of appellant's conduct was to abandon the invention to the public. This we do not decide, because that question is not before us. An interference cannot be declared between an inventor who has dedicated his invention to the public, without ever making application for a patent, and one making such an application. It would seem clear that, if one has forfeited by his conduct the right to receive a patent, it necessarily must follow that he has forfeited his right to have considered any proof of priority of invention in an interference proceeding.

The case of Bates v. Coe, 98 U. S. 31, 46, 25 L. Ed. 68, was also an infringement case. While not necessary, perhaps, to the decision of that case, the court in its opinion said: "Inventors may, if they can, keep their invention secret; and if they do for any length of time, they do not forfeit their right to apply for a patent, unless another in the mean

time has made the invention, and secured by patent the exclusive right to make, use, and vend the patented improvement. *Within that rule and subject to that condition, inventors may delay to apply for a patent. * * *"* (Italics ours.) Here the court recognized the principle involved in the Mason v. Hepburn Case.

The case of Consolidated Fruit Jar Company v. Wright, 94 U. S. 92, 96, 24 L. Ed. 68, was an infringement case involving an improvement in fruit jars. One of the defenses was that the patentee had abandoned the invention to the public. The opinion states that the patentee, assignor of the complainant, reduced his invention to practice in 1859. He did not apply for a patent until January, 1868, nearly nine years after his reduction to practice of the invention. He secured his patent in May, 1870. It appears from the opinion that one Rowley defended the suit in the name of Wright, the appellee. The court, in its discussion of the delay of Mason in applying for a patent, said:

"Rowley, in 1864, was selling jars known as the *Excelsior*. In the spring of 1866 he was called upon by Imlay, who charged that the *Excelsior* infringed a patent issued to him in 1865, which was for a jar such as the appellee is called to account in this case for selling. He bought from Rowley. Rowley took a license from Imlay, and thereupon commenced making and selling jars made according to Imlay's patent. These jars were nearly identical with those described in the Mason patent. A part of those sold had only glass tops, without the metallic covering, which Mason's patent called for. The residue had such covering. Prior to the beginning of the year 1868 he had sold of the jars with glass tops from two hundred and fifty to four hundred gross, making the minimum thirty-six thousand. Before the same period, he had sold a large number of those with the metallic top, and otherwise the same in construction. Thus, before Mason applied for his patent, and as early as 1866, the public was in possession of the invention in question from sources entirely independent of Mason.

"It is enough to say, without recapitulating the facts, that in our judgment the defence of abandonment to the public is also clearly made out.

"*He who is silent when he should speak must be silent when he would speak, if he cannot do so without a violation of law and injustice to others.* [Italics ours.]

"*The supineness of the patentee is unexplained and inexcusable. A principle akin to the doctrine of equitable estoppel applies.* [Italics ours.]

"Inventors are a meritorious class. They are public benefactors. They add to the wealth and comfort of the community, and promote the progress of civilization. A patent for an invention is as much property as a patent for land. The right rests on the same foundation, and is surrounded and protected by the same sanctions. There is a like larger domain held in ownership by the public. Neither an individual nor the public can trench upon or appropriate what belongs to the other. The inventor must comply with the conditions prescribed by law. If he fails to do this he acquires no title, and his invention or discovery, no matter what it may be, is lost to him, and is henceforward no more his than if he had never been in any wise connected with it. It is made, thereupon, as it were by accretion, irrevocably a part of the domain which belongs to the community at large. The invention here in question is within this category."

If, as the court said, a principle akin to the doctrine of equitable estoppel applies, to invalidate a patent because of the conduct of the patentee before filing his application, it would seem that the same principle must apply in an interference proceeding where priority of invention is the only issue. Appellant is a party to this interference only because he claims rights under the patent laws. If, by reason of his conduct before the filing of his application, he lost any rights that he once had, how can he in an interference proceeding be permitted to prove priority of invention? The whole purpose of an interference proceeding is to determine certain rights of the parties under the patent laws, and, if the evidence produced in the proceeding establishes that appellant has no existing rights, how can it be held that he is entitled to an award of priority of invention?

If, by reason of appellant's conduct, "a principle akin to the doctrine of equitable estoppel applies," he cannot be permitted to assert or prove that he was a prior inventor, and any evidence in the record that he was such prior inventor cannot be considered in determining the question of priority of invention. Whether such evidence can be considered by the Patent Office in passing upon the question of whether a patent should ultimately be issued to appellee, it is not necessary for us to determine, for that question is not before us.

It is true that, as intimated by the Supreme Court in the case of Consolidated Fruit Jar Company v. Wright, supra, the

facts in that case were not such as to give rise to a true equitable estoppel, as the same has been interpreted by the courts, but, nevertheless, "a principle akin to the doctrine of equitable estoppel" was applied; so, in the case at bar, while the facts do not establish a true equitable estoppel, they do demand the application of the doctrine laid down by the Supreme Court in the case last cited. Accordingly, for the sake of brevity in this opinion, where we shall refer to that doctrine as "equitable estoppel," it is to be understood that the phrase is used with the above stated qualification.

 We are of the opinion that the spirit and purposes of the patent laws require the application of the rule of equitable estoppel in cases like the one at bar. The constitutional provision, article 1, § 8, clause 8, upon which all patent legislation rests, provides that "the Congress shall have Power: * * * To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Patent laws are enacted pursuant to this provision, not primarily for the benefit of individual inventors, but for the benefit of the public. As said in Kendall v. Winsor, supra: " * * * Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these. * * * " In that case the court also said, as heretofore quoted: " * * * The inventor who designedly, and with the view of applying it indefinitely and exclusively for his own profit, withholds his invention from the public, comes not within the policy or objects of the Constitution or acts of Congress. He does not promote, and, if aided in his design, would impede, the progress of science and the useful arts. And with a very bad grace could he appeal for favor or protection to that society which, if he had not injured, he certainly had neither benefitted nor intended to benefit."

So here, appellant, who allowed his invention to rest in his own mind, and in a model stored in his basement, for a period of at least ten years, withholding from the public any knowledge of it, intending ultimately to secure a patent for it, but delaying to apply therefor for fourteen years, and until another inventor had entered the field, and, by his independent efforts, genius, skill, and ex-

penditure of money, had discovered the invention, and given to the public knowledge of it by placing it upon the market and applying for a patent, has not promoted "and, if aided in his design [by now granting him an award of priority], would impede, the progress of science and the useful arts."

We see no reason why the principle of the doctrine of equitable estoppel should not apply to such a case when the question of priority of invention arises in an interference proceeding. This principle is concisely stated in the case of Stone v. Bank of Commerce, 174 U. S. 412, 19 S. Ct. 747, 753, 43 L. Ed. 1028, where the court, speaking of true equitable estoppel said: " * * * it rests upon the doctrine that it would be against the principles of equity and good conscience to permit the party against whom the estoppel is sought to avail himself of what might otherwise be his undisputed rights."

So here, if appellant should now be permitted to prove in this proceeding that he was the first inventor, and therefore entitled to rights under the patent laws, it would be against the principles of equity and good conscience, because, by appellant's failure to make public his invention or apply for a patent, appellee devoted his genius and efforts and time to the discovery of that which, in fact, had been discovered by appellant, but which discovery had been concealed and suppressed by him. He did so at his peril, the risk undertaken being that another might independently and in good faith make the same invention and apply for a patent upon it, in which case appellant could not, in equity and good conscience, be awarded priority of invention in a contest between himself and the later inventor as to which had the prior right of protection of the patent laws.

Robinson on Patents, in a footnote to section 390, well states the reasons for the application of the doctrine of estoppel, said footnote being as follows:

"There seems to be no good reason why the doctrine of estoppel should not be applied in its fullest extent to an inventor who, having completed his invention, voluntarily delays his application for a patent. In the present condition of industrial enterprise he may be fairly chargeable with knowledge that other persons skilled in the art to which his invention appertains have perceived the same want, that they are striving to discover means by which this want may be removed, and that their inventive efforts are very likely to result in the same art or instrument which he already has produced. If under

these circumstances he wilfully keeps silent concerning his prior discovery and permits these later inventors to expend their money, time, and energy in endeavors which would be at once abandoned were he to disclose the character of his own invention, he is certainly not entitled, on any principle of justice and fair dealing, to urge against them his superior right after they have completed their inventive acts and diligently attempted to secure the benefit of the invention to themselves and to the public by applying for a patent.

"This doctrine would probably have long ago met with universal acceptation had it not been unnecessarily confounded with abandonment of the invention to the public, which rests upon the actual or presumed intention of the inventor to relinquish his exclusive right to the invention in favor of the community at large.

"Abandonment and estoppel have, it is true, an indirect relation to each other. An invention can be dedicated to the public by no one but the true inventor, and of several rival inventors he only can abandon the invention to whom the law would otherwise secure it by a patent. Hence if the prior conceiver, having been diligent in reduction and not estopped, by negligence in applying for a patent, from claiming the invention as against his rival, chooses to secure it by a patent, no act or omission of the rival can dedicate it to the public. But if the prior conceiver has been negligent in reduction, whereby the later conceiver has become in law the first inventor, or if, although the first reducer as well as first conceiver, he has delayed his application for a patent until he is estopped to assert his rights against a later inventor, then the latter may either patent the invention to himself or may abandon it to the public at his pleasure. In this method estoppel may be one step in a series of events which results in the total surrender of the invention to the public."

In so far as the statement quoted is applicable to interference proceedings, it meets with our approval. As said before, we express no opinion as to whether the appellee in this case is entitled to a patent; that question is not before us, and we decide only that, as between appellant and appellee, appellee is entitled to an award of priority in this interference proceeding. It is therefore unnecessary here to express any opinion upon that part of the above quotation not applicable to interference proceedings.

We may add that the rule laid down in Mason v. Hepburn, has been expressly approved in the case of Colman et al. v. Hathaway et al., 285 F. 602 (District Court, D. Massachusetts). In that case the rule was approved, as we here approve it, upon the ground of estoppel.

We think it proper to state that, as estoppels preclude a party from showing the truth, they are not favored and should not be applied to any case where the facts do not clearly justify their application.

With reference to the cases of Milburn Company v. Davis-Bournonville Company, 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651, and Corona Cord Tire Company v. Dovan Chemical Corporation, 276 U. S. 358, 48 S. Ct. 380, 72 L. Ed. 610, relied upon by appellant, it is sufficient to say that the questions here decided were in no way involved in those cases and were not discussed in them. The same observation is true of those cases decided by this court cited by appellant, except the case of Townsend v. Smith, 36 F.(2d) 292, 296, 17 C. C. P. A. 647. In this case, after using the language quoted in appellant's brief, this court said: "Townsend had a right, after having conceived and disclosed his invention, to wait until October and he did not forfeit his right to apply for a patent thereby unless someone else, in the meantime, had made the same invention and secured by patent the exclusive right to make, use, and sell it. Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Mason v. Hepburn, 13 App. D. C. 86."

The case of Alfred B. Seppmann v. John J. Roden et al., 46 F.(2d) 186, 18 C. C. P. A. ——, decided concurrently herewith, presents some of the questions that are here involved.

The decision of the Board of Appeals is affirmed.

Affirmed.