## ALTORFER et al. v. HAAG.

### Patent Appeals Nos. 3347, 3348.

Court of Customs and Patent Appeals.
Dec. 24, 1934.

130

See, also, (Cust. & Pat. App.) 74 F. (2d) 135.

Joseph H. Milans, of Washington, D. C. (La Porte & La Porte, of Peoria, Ill., of counsel), for Altorfer.

Norman B. Frost, of Washington, D. C. (M. Theodore Simmons, of New York City, of counsel), for Dehle.

George L. Chindahl and C. Paul Parker, both of Chicago, Ill., for Haag.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

This is a three-party interference proceeding in which Altorfer, as one of the defeated parties in the United States Patent Office, and Dehle as the other, have appealed from the decision of the Board of Appeals which awarded priority in the seven counts of the interference involved to appellee Haag.

The counts relate to an improvement in a washing machine of the type which has in the central portion of the tub an upstanding tubular column, which comes through the bottom of the tub and in water-tight engagement therewith. Through the tubular column is a vertical drive shaft extending to the top of the column. At the top of the column a water agitator, technically styled a "dolly," of the inverted or submerged type, is fastened. The dolly extends to the bottom of the tub and is so positioned as to have the lower part of the dolly beneath the water and the articles to be washed.

It was found that the articles in the tub which were being washed would get between the lower part of the dolly and the tub. This was overcome by making the dolly smaller than the tub and surrounding the lower edge of the dolly with a ring, the ring thus placed permitting the dolly to extend down into the tub so as to keep the clothes from coming into contact with the bottom part of the dolly. With the ring we are not concerned here, except as facts relating to it, shown in the record, may throw light upon inquiries which are pertinent to the issues here involved. The subject-matter of the ring is involved in companion interference No. 56,454, Altorfer v. Haag, 74 F. (2d) 135, 22 C. C. P. A. (Patents) —— (patent appeal No. 3349), decided concurrently herewith.

The Examiner of Interferences and the Board of Appeals gave Altorfer a date of not later than the spring of 1921 as the date of conception. The Examiner of Interferences held that the work of Altorfer in the spring of 1921 also amounted to a reduction to practice of the issues involved.

The board held that Haag did not conceive until the fall of 1923, and Dehle in the fall of 1924. The Examiner of Interferences held that since Altorfer conceived and reduced the invention to practice before either of the other parties had conceived the same, he was the first inventor and was entitled to an award of priority in the invention in all the counts involved.

Altorfer filed his application for a patent on the washing machine which embodied the invention of the counts at bar on May 21, 1925. On November 21, 1927, Altorfer copied claims 14, 15, 16, 17, and 18 of a patent to Haag, reissue No. 16,746. On February 27, 1928, the examiner declared an interference with claim 17 (count 1 at bar) as the subject. Claims 14, 15, 16, and 18 are counts 1, 2, 3, and 4 of the companion interference. Counts 2 to 7, inclusive, of the present interference (being claims 10, 11, 12, 14, 15, and 18 of the Haag reissue patent) were added by the examiner for the purposes of interference on February 21, 1930, "pursuant to the decision of the Law Examiner dated July 24, 1929," which latter decision does not appear in the record. Haag filed July 25, 1924, and Dehle filed September 6, 1924. Haag's patent was reissued on September 27, 1927, application for which reissue was filed on February 19, 1927. Dehle's reissue application was filed May 6, 1926. As indicated above, there are seven counts in the instant interference, of which count 1 is illustrative and follows: "1. In a washing machine, a tub, having an opening centrally disposed in the bottom thereof, a vertical drive shaft projecting through said opening to a point above the normal water level in the tub and adjacent to the top thereof, means for sealing said opening, and means for agitating the contents

of the tub, said agitating means comprising a disk-like member arranged adjacent to the bottom of the tub and having the periphery thereof spaced a substantial distance from the wall of the tub, a central sleeve projecting upwardly from said disk to a point adjacent the upper end of the drive shaft, means for positively connecting the upper end of said sleeve with the drive shaft whereby the agitating means is driven from said shaft."

Throughout the proceeding it was urged that in view of Altorfer's long delay in getting into the Patent Office (over four years from the date of conception) and in view of his conduct during that period and subsequent to his filing date, he should be estopped from claiming the counts; that if he had completed his invention as claimed, he suppressed and concealed it and only came forward with it after being spurred into activity by knowledge of the activities of Haag, relying on the case of Mason v. Hepburn, 13 App. D. C. 86. It was further contended that if the rule in Mason v. Hepburn, supra, did not apply, the facts indicated that instead of what Altorfer did in 1921 amounting to a reduction to practice, it should be regarded as showing only an abandoned experiment.

The Examiner of Interferences held that there was a complete reduction to practice in 1921 by Altorfer, and that there was no such concealment, suppression, or abandonment as to warrant application of the doctrine of Mason v. Hepburn, supra.

The Board of Appeals regarded certain tests made in 1921 by Altorfer as unsatisfactory and said: "We believe considerable uncertainty arises here as to whether this constitutes a reduction to practice * * *." The board, in awarding priority to Haag, seemed to be influenced largely by the fact that the wooden dolly, Altorfer's Exhibit 8, made and used by Altorfer in 1921, was "maintained in secrecy, locked in a vault or store room," and stated that if Altorfer's 1921 activities amounted to a reduction to practice, the case fell within the said Mason v. Hepburn doctrine. The board stated: "We, however, prefer the first view as to this situation." The first view expressed was that Altorfer's work in 1921 did not amount to a reduction to practice, and that Altorfer was not diligent until he finally reduced the invention to practice subsequent to Haag's filing date.

After very careful consideration of the record, we are convinced that Altorfer conceived and reduced to practice the inven-

tion expressed by the counts involved as early as the spring of 1921, which was before either of the other parties entered the field. We think the facts of record do not warrant the conclusion either that Altorfer was guilty of such conduct as made the doctrine of Mason v. Hepburn, supra, applicable, or that the facts as a whole justify the conclusion that what he did in 1921 amounted to only an abandoned experiment. The record is a voluminous one, and much of it is devoted to happenings in the year 1921 or subsequent happenings which throw light upon Altorfer's 1921 activity. The facts are not involved or uncertain, but, owing to the importance of the issue, we think a rather full statement of such facts, as relate to Altorfer's reduction to practice and subsequent conduct, are here required. Our conclusions obviate the necessity of a discussion of the activities of either Haag or Dehle.

Altorfer's company, Altorfer Brothers Company, was a manufacturer of washing machines in East Peoria, Ill. Haag's company, Haag Brothers Company, a competing concern, was also located at the same place. Altorfer Brothers Company manufactured and sold more than one kind of washing machine, it being shown that it was their policy to furnish the kind of machine the trade required; that among such machines sold was the "Alco" washer, in which was a "floating" dolly which rested on top of the clothes and which was driven from the top of the shaft that projected from the bottom of the tub, the driving mechanism being beneath the tub. The improvement involved in this interference, as before stated, relates to the substitution of a submerged dolly for the floating dolly.

It is of record that in 1920 Altorfer Brothers Company felt required to make some improvement over the Alco machine with a view of meeting competition, and that the idea involved in the counts at bar was then under consideration, and the first so-called submerged dolly was built. In view of later activities, it is not necessary to consider the 1920 dolly. It is not disputed, and we think the record clearly shows, that in the spring of 1921, Altorfer's Exhibit 8, which is before us, a wooden dolly of the submerged type, with a wooden ring surrounding the bottom of the same, was constructed and tested in the Altorfer Brothers Company plant in an Alco machine. It is conceded that Exhibit 8, together with Altorfer's Exhibit 1, an Alco machine, meet fully the requirements of the counts involved. Haag does not

question that Altorfer's Exhibit 8 was constructed and experimented with in 1921, but Haag does contend that it was not sufficiently tested as to amount to a reduction to practice.

In the spring of 1921, Altorfer ordered one Schellenberg to make a wooden dolly that would comprise a round disk with a conical center. One Vance made the dolly and the ring under Schellenberg's direction. Altorfer at that time was vice president of Altorfer Brothers Company, while Schellenberg was employed by that company as an experimental and developing engineer. At the time of giving testimony, however, he was an engineer with the Federal Electric Company of Chicago. Vance worked for Altorfer Brothers Company as a pattern maker in 1921, and at the time of giving testimony was superintendent of school buildings in the city of Peoria. The making of the dolly and the ring is clearly shown by said three witnesses. The dolly so made was of wood, conical in shape, with four equally spaced paddles. The paddles or wings did not extend upward to the top of the tubular column centrally located. The feature of having the paddles or wings extend upward on the post was a later development with which we are not here concerned. Altorfer and Schellenberg testified that the dolly was tried in an Alco washing machine. Alco machines were manufactured before, during and after 1921 by the Altorfer Brothers Company, and were being manufactured and sold by them at the time of taking of testimony in 1930. The original dolly made in 1921 is in evidence. The original wooden ring was broken in use and others were made in 1921 and 1922. The original Alco machine in which the dolly was used, according to the record, was damaged and lost, but as a prototype Altorfer produced, as Exhibit 1, another Alco machine in which the dolly and ring are placed in operable position. With this machine are two adjuncts, both of the floating dolly type, one known as the "rubboard" dolly and the other known as the "peg" dolly. An additional sleeve goes with the machine for the optional use of these two dollies.

Altorfer testified that in 1921 he put the dolly in the said Alco machine, and operated the machine and "watched the water action," and "put clothes in and watched the clothes action"; that this was done "a number of times over a period of several months"; that he watched the results when a few pieces of cloth were used and when a full load of six pounds was used; that he noticed that the water had more agitation and that the machine would wash faster than the Alco machine, and that it washed the clothes clean; and that it showed that the machine would work to the users' entire satisfaction, if put on the market.

Schellenberg corroborated the testimony of Altorfer, and went into more detail, showing that the machine was tested with water, soap, and clothes, that the machine gave a "wonderful" water demonstration, and that the results were "exceptionally good" in the cleansing of materials; that they put rags and overalls in the tub; that the guard ring successfully kept the clothes from getting under the edge of the dolly; and that thereafter the operations were carried on several times in making comparison tests with the cylinder type machine and the oscillator type machine, which machines were both being marketed by Altorfer Brothers Company in 1921. Schellenberg said that he tested the machine by the use of a handkerchief or tie and on up to "four to six pounds, sometimes over," of materials which were weighed by him; that several guard rings had to be made because in leaving the guard rings in the water overnight they would swell and the rings would get "out of round."

The evidence shows that between the years 1921 and 1923 the machine was tested frequently in comparative tests, that is, to compare its action and results with those of other machines such as the vacuum cup machine and the "Snowdrift" machine. The submerged dolly was frequently demonstrated in 1922, 1923, and 1924. These tests were made with a view of ascertaining the best manner of manufacturing the dollies for the trade, that is to say, whether the dollies should be of wood, metal, part wood, or part metal. It was also desirable to ascertain what number of blades or paddles would give the best results. Tests and demonstrations were also made in order to ascertain if fins or small blades might not be added to the upper portion of the dolly as were added to a "Double-A" machine, which was a later development of machine but which is not involved in the issues of this interference. Since Altorfer was the manufacturer and seller of several different kinds of machine, it seems obvious from the facts shown in the record that trade considerations, competition, cost of manufacture, and many other related matters were under consideration. During these tests it was not the purpose of Altorfer to supplant the Alco machine on the market. In fact, the new machine never did supplant the Alco ma-

chine, which was still being sold by Altorfer Brothers Company at the time of taking the testimony. The tests referred to included the use of square tubs and copper tubs with dollies of the submerged type, the square tub being made and tested in the fall of 1923.

The witness MacDonald, who was an experimental mechanic and engineer in the Altorfer Brothers Company plant in 1921, testified to the existence of the 1921 dolly when he entered the employ of Altorfer Brothers Company in 1922, and that he repaired the wooden dolly some time in the summer of 1923 by replacing the bearing plate on the bottom of the dolly, because the former plate was "cutting into the center post" on which it was bearing. This fact, we think, shows extensive use of the dolly. MacDonald testified as to using the dolly in making efficiency tests for washing action between the spring of 1923 and the fall of that year and stated that said tests were made in conjunction with the wooden guard ring. Some of the tests made with the 1921 dolly were made by running the machine "day and night until the clothes sometimes became a pulp," but the record shows that there was no damage to the clothes during a normal washing period and no damage to the dolly. In the fall of 1923 and the spring of 1924, according to MacDonald, work was done on certain sheet metal dollies with metal and wooden rings; that the dollies were operated, and "very good" washing results were obtained.

Altorfer testified that on the completion of the 1921 wooden dolly he operated the machine with clothes; he later explained that their testings customarily were made with dirty overalls, and that the overalls were cut in half, testing first one half and then the other for comparison; that soiled overalls of men working in the plant were used.

It is shown by the record that at such times when the dolly was not in use in experimentation it was kept in the vaults of the company; that the experimentations were made openly in the plant of the company. In August, 1924, prior to any knowledge Altorfer could have had of the Haag machine, as is hereinafter referred to, Altorfer showed a machine involving the invention in issue to William B. Henri, member of an advertising firm, with the idea of running a test advertising campaign. Henri selected the Snowdrift machine to make the test with "because it looked to us to be the most spectacular machine to advertise." Henri was somewhat indefinite as to the particular kind of machine

he saw, but indicates a belief that it was a machine involving the issue here involved.

Schellenberg states that on February 13, 1925, he completed the Double-A machine, which was substantially like a machine that went into production in May, 1925. In this machine the agitator had four wings.

It is stated in the record that the time required to get a machine into commercial production was about five or six months. The dolly used in the machine which was finally produced by Altorfer had supplemental vanes along the central post, which gave additional clothes action, which subject-matter is not involved in this interference. These vanes were added in the winter of 1924 or spring of 1925. There were other witnesses who testified to certain activities occurring during the years 1924 and 1925. This testimony may have some bearing upon the question of continued activity on the part of Altorfer, but is not of sufficient importance to necessitate a recital of it here.

Haag contends here that there was no sufficient test made by Altorfer prior to Haag's entering the field which would demonstrate the completion of the invention, and argues that it was necessary in the testing of a washing machine to test it on a wash such as would be made in the household; that it was not sufficient to test it upon a small amount of clothes or one particular kind of clothes; that a shop test is not sufficient; and that the conduct of Altorfer after making the wooden dolly in 1921 indicates that he was not satisfied with it and had not become convinced that it worked satisfactorily. Haag argues also that the fact that Altorfer did not file his application until after he became aware of the fact that Haag had placed a machine embodying his invention on the market, and did not claim the invention for the purpose of interference until November 21, 1927, after Haag had repeatedly notified Altorfer to refrain from infringing his patent, and sought a lease for manufacturing under the Haag patent, shows that Altorfer did not regard himself as the first inventor.

It affirmatively appears in the record that Altorfer, subsequent to filing his application on May 21, 1925, indicated a willingness to operate under a free license from Haag. It is obvious that the record does not disclose all the circumstances relating to this subject-matter.

The mere fact that one party to an interference indicates a willingness to operate under a free license from the other does not, of

itself, show that the party seeking such license does not regard himself as the first inventor, or that he, in fact, had not completely reduced his invention to practice. In cases where the question of reduction to practice is a close one, this kind of circumstance may be, and often is, taken into consideration in arriving at a conclusion as to whether or not there was an actual reduction to practice. But where the record is clear, as in the case at bar, that there was an actual reduction to practice, such a circumstance does not require a holding that there was no reduction to practice. Osgood v. Ridderstrom, 71 F. (2d) 191, 21 C. C. P. A. (Patents) 1176.

We are of the opinion that the record shows that Altorfer had fully reduced his invention to practice by the spring of 1921, or in any event had done so before Haag had entered the field, and that the record does not disclose facts which indicate that Altorfer abandoned his invention, or that he ever suppressed or concealed the same in such a way as to make applicable the doctrine in the case of Mason v. Hepburn, supra. Altorfer's long delay in filing his application after the reduction to practice and his acts subsequent to his reduction to practice do not indicate any intention to abandon the invention, but, on the contrary, his subsequent acts indicate an intention to utilize and commercialize the invention at a date dependent upon the result of tests and upon other considerations which we think were wholly reasonable and proper under the circumstances for him to take into consideration.

As to the contention of Haag that he was spurred into activity, Altorfer replies in substance that if he was spurred, he was not spurred to any great extent, since he did not file his application until May, 1925, after seeing the Haag machine in February, 1925, and after Schellenberg had seen the Haag machine in the fall of 1924, and he did not claim, for interference purposes, the issue of the counts until November 21, 1927.

It is argued by Haag that it is not essential in order that the doctrine of Mason v. Hepburn, supra, apply, that there should be a spurring into activity. It is not necessary to pass upon the question as to whether the facts of record disclose such a spurring into activity or not, in view of the fact that we conclude that there was no suppression or concealment. Suppression and concealment for a long period of time, seven years, together with a spurring into activity, were the basis of the holding in Mason v. Hepburn, supra. In that case there was a deliberate withholding of the invention from the public by Mason for motives not in harmony with the purposes of the patent law for a period of seven years, and he only claimed it then when he saw the patent going to another. A very different case is presented on the present record.

We have frequently discussed the doctrine of Mason v. Hepburn, supra, and have definitely indicated that we will not extend it. We said in Miller v. Hayman, 46 F.(2d) 188, 18 C. C. P. A. (Patents) 848, that the doctrine of estoppel (or the doctrine akin to equitable estoppel, Consolidated Fruit Jar Co. v. Wright, 94 U. S. 92, 24 L. Ed. 68) was not favored, since estoppels preclude a party from showing the truth. The case of Severson v. Olson, 64 F.(2d) 694, 697, 20 C. C. P. A. (Patents) 946, involved facts in many respects similar to those at bar. We there fully set out our views as to the doctrine of the Mason v. Hepburn Case, supra, as far as the facts of Severson v. Olson, supra, would permit. Much of what we said there is applicable here. We quote:

"After very careful consideration of the record facts we conclude that such activities of Severson and his company as are shown to have occurred during this controverted period of nearly two years negative suppression and concealment rather than support them. We think the Board was in error in applying the doctrine of Mason v. Hepburn, supra, so as to deny Severson priority of the involved invention. He was clearly the first inventor, in fact, and we think should have been so regarded in law. * * *

"Whether the 'spurred into activity' consideration is or is not an essential factor of every case, we are not inclined to apply the doctrine of equitable estoppel unless this fact is present or unless the circumstances as a whole are equally persuasive of the inequitable position of the first inventor. In other words, we are not disposed to extend the doctrine or make more liberal application of it in interference cases than was made in Mason v. Hepburn, supra. On the contrary, we recognize the danger that might flow from its loose application, and that, unless great caution is observed, it might be gradually extended until its application resulted in far greater inequities than it was designed to cure. Only where such gross inequities clearly threaten to defeat the spirit and the purposes of the patent laws must it be given controlling effect."

In the case at bar, Altorfer never indicated a disposition either to regard his in-

vention as a failure or to withhold it from the public. Upon the record before us we cannot regard his activities in 1921 as an unsuccessful experiment which was abandoned, and which, therefore, did not amount to a reduction to practice. We think he fully reduced the invention to practice in 1921, and, being the first inventor, he can only be deprived of his award of priority by a clear showing that his subsequent conduct places him clearly within the doctrine announced in Mason v. Hepburn, supra. No one can read the record before us without being convinced that Altorfer is not in the position of a successful inventor who, after making an invention, secretes it with a view of withholding it from the public for some motive not in harmony with the purpose of the enactment of the patent laws. The fact that the public did not get it until after Haag had claimed it is of itself not conclusive that Altorfer intended to suppress the same in the sense that suppression was used in Mason v. Hepburn, supra. Conceding that Altorfer's activities and delay, when considered with the explanations offered, do not show such promptness and diligence as the framers of the patent laws might hope for, and conceding that such delay has worked a hardship upon Haag and Dehle, or at least one of them, nevertheless, for reasons which we have hereinbefore stated, we do not think there are such inequities shown as to bar the first inventor in fact from being regarded as such for patent purposes.

The following are some of the leading cases on the applicability of the doctrine akin to the doctrine of equitable estoppel laid down in Mason v. Hepburn, supra; Severson v. Olson, supra; Miller v. Hayman, supra; Nystrom et al. v. Mancuso, 64 F.(2d) 698, 20 C. C. P. A. (Patents) 934; Jardine et al. v. Long, 58 F.(2d) 836, 19 C. C. P. A. (Patents) 1243; Rhinevault v. Pfiester, 65 F.(2d) 161, 20 C. C. P. A. (Patents) 1112.

In view of the above conclusions, it is unnecessary to consider Haag's and Dehle's records or their activities in connection with the invention at issue. Neither tribunal gave either Haag or Dehle a conception date earlier than September, 1923. It is not necessary for us to consider the question of diligence on the part of Altorfer. His activities subsequent to 1921 may be relied upon, however, as negativing abandonment, suppression, or concealment.

It is our conclusion that Altorfer, being the first to conceive and the first to reduce to practice the invention expressed in the counts at bar, and not having suppressed or concealed his invention so as to make applicable the doctrine akin to equitable estoppel, is entitled to the award of priority in this proceeding. The decision of the Board of Appeals is reversed, and priority of invention of all the counts at issue is awarded to appellant Altorfer.

Reversed.

LENROOT, Associate Judge, concurs in the conclusion.