39 C.C.P.A.(Patents)

## MASCIARELLI v. FOERSTE.

### Patent Appeal No. 5898.

United States Court of Customs and Patent Appeals.

Argued May 7, 1952.

Decided June 24, 1952.

Charles R. Fay, Worcester, Mass. (Munson H. Lane, Washington, D. C., of counsel) for appellant.

No appearance for appellee.

Before GARRETT, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Judges.

JACKSON, Judge.

Appellant has appealed from a decision of the Board of Interference Examiners of the United States Patent Office in an interference proceeding awarding to appellee priority of invention of the subject matter embraced within a single count which reads as follows:

"1. In a system for operating and regulating an electric discharge tube having thermionic electrode filaments, a source of alternating current, a transformer providing a closed magnetic core having two relatively long legs and two relatively short legs connecting the respective ends of said long legs, primary and secondary windings each providing a coil disposed on the same long core leg, with the end of each primary coil being spaced axially of a long core leg from the end of each secondary coil, to permit a relatively large magnetic leakage between said long legs, means connecting the coils of said secondary winding and said tube in a closed series circuit, filament energizing windings having the terminals connected to said tube filaments, with each filament winding being disposed on a long core leg in a space between said primary and secondary coils, and means for connecting both terminals of said primary winding to said source, whereupon sufficient voltage is developed by said filament energizing windings to immediately heat said filaments to a temperature where electrons are emitted and inonization of the gas in the tube takes place, at the open circuit voltage between the electrodes as developed by said primary and secondary windings, with the magnetic flux density in a long core leg at the location of each filament energizing winding being such that the voltage developed by such windings and resulting heating current in the filaments is reduced from its initial starting value to a lower value when the tube is ionized and operating with a reduced steadystate voltage across its electrodes, due to the back electromotive force induced by flow of arc current through the secondary winding which is out of phase with the voltage across the secondary induced from the primary, and with the out of phase current in said secondary winding being in full control of the energy output of each filament winding to obtain the desired degree of filament heating for operating the tube."

On March 16, 1950, the interference was declared. It involves a patent of appellant, No. 2,455,791, dated December 7, 1948, issued upon an application entitled "System For Operating Electric Discharge Tube," serial No. 693,217, filed August 27, 1946, and a patent application of appellee, serial No. 617,037, filed September 18, 1945, which is entitled "Transformer For Regulating The Operation Of Hot Cathode Gaseous

Discharge Lamps." One-half interest of the application is assigned to Eugene A. Quarrie.

The count is a substantial copy of the only allowed claim in the patent of appellant who is the junior party and therefore has the burden of establishing priority of invention by a preponderance of the evidence.

Both parties filed preliminary statements. In that of appellant it is stated that on April 7, 1942, he started working on a model of his device; that the date of actual reduction to practice and disclosure of the invention to others was April 17, 1942; and that on February 10, 1943, the first drawing and written description of the invention were made. The preliminary statement on behalf of appellee (deceased) made by his hereinbefore mentioned assignee, alleged that the invention was first disclosed to others and demonstrated by appellee during the latter part of 1944; that the invention was actually reduced to practice on or about April 5, 1945; and that the first drawing and written description of the invention were made on May 3, 1945. Both parties allege the exercise of reasonable diligence, that of appellant beginning April 7, 1942, and that of appellee May 3, 1945.

Appellant alone took testimony at the taking of which the appellee was not represented.

The case was submitted below at final hearing on briefs by both parties and there was no appearance here for appellee either by brief or argument.

The interference relates to a system for operating an electric discharge tube having thermionic electrode filaments.

We are troubled by the language used in the decision of the board. After having noted the burden under which the junior party rests, it is stated in the opinion that "He derives no advantage in the proceeding by the fact of the inadvertent issue of his patent." What meaning can be attached to that we are at a loss to understand. What difference does it make whether or not the patent was inadvertently issued? Further on in the decision of the board, it is stated that:

"The count may be summarized by saying that it requires physically that six transformer coils be arranged symmetrically on two long legs of a rectangular core, and electrically that the intermediate coils on each leg function as low voltage filament excitation secondaries for a filament electrode tube, two extreme coils function as a discharge current secondary, and that leakage of the primary magnetic flux between the primary and the secondaries be effective to reduce the voltage on all the secondaries upon current flow in the discharge secondary. This analysis fails to reveal an obviously invention-characterizing feature or relationship, and we have been moved to examine the record of the Masciarelli application in order to ascertain, if possible, just what was supposed to be the kernel of the invention when the claim was finally allowed. For, although the counts of an interference are ordinarily regarded as speaking for themselves, and all expressed limitations must be regarded as equally essential in testing priority (particularly the claim of a patentee as against himself), it is proper to elucidate the principle of invention of the recited combination as an aid to the understanding and evaluation of the proffered proofs. Also the prolixity of the count is in itself a kind of ambiguity which needs must be penetrated before the subject matter may be intelligently treated."

It appears to us from the above quotations that the board was dealing with the validity of the patent rather than the question of priority. The sole issue before the board and here is that of priority of invention and, to our understanding, the matter of validity of the patent is not an issue in a proceeding such as this. Long v. Young, 159 F.2d 766, 34 C.C.P.A., Patents, 871; Mantz v. Jackson, 140 F.2d 161, 31 C.C.P.A., Patents, 824; Scheinman v. Zalkind, 112 F.2d 1017, 27 C.C.P.A., Patents, 1354; Miller v. Hayman, 46 F.2d 188, 18 C.C.P.A., Patents, 848..

It is noted in the decision that in the ex parte prosecution of the application

of appellant the first nine claims presented were rejected on several references. What that has to do with the present issue we do not know. We must assume that the application and the claim were both understood by the Patent Office when the patent issued.

Subsequently, it is stated in the decision that "The purpose of the invention of Masciarelli, assuming it to be an invention as we do for the purpose of this proceeding, is to provide a transformer system which will be an acceptable substitute for the direct connected systems of fluorescent tube energization then in use. To be reduced to practice, a system must have been actually produced which showed practical utility of that order. The record for Masciarelli is deficient in such a showing either before or after his adversary's filing date."

No motions were filed in the interlocutory period by either party. That procedure was available if it was thought that the interference should have been dissolved for any proper reason.

The board, apparently on the theory that there was an invention made by the appellant, cursorily discussed the record on behalf of appellant and concluded that he had not met the burden of establishing conception of the invention defined by the count.

Appellant has been in the business of manufacturing neon signs since 1938. He was tendered Exhibit No. 1, which was a print copy of a drawing appearing in the patent of appellant known as "Fig. 1'" and he explained the operation of the core and coils depicted thereon with relation to the lamp as follows:

"A. Coils 16 and 16′ are the primary coils. They energize coils 30 and 31 to light up the filaments of lamp 10. At the same time, coils 22 and 22′ are energized and after the filaments are lit, it will strike an arc across the lamp 10. When lamp 10 strikes an arc, then coils 22 and 22′ are energized, thereby causing a reactive force to work on coils 30 and 31′, de-energizing the filaments 11 and 11′.

"Q. 5. De-energizing them? A. Yes.

"Q. 6. Thereupon the fluorescent tube will stay lit as ordinary tubes? A. Yes. Stable, stay lit stable."

He was then handed a pencil sketch known as Exhibit No. 3, signed "Percy A. Robinson, March 20, 1943." The sketch also bore the signature of appellant signed on the same date. Another exhibit, No. 2, signed by appellant and witnessed by William J. Walsh, Jr., dated March 31, 1943, was called to the attention of appellant.

He testified that Exhibit No. 2 is a pencil sketch in which is shown a rectangular member with two long and two short sides. He stated that the coils on the end of the rectangle are the primary coils and those on the opposite ends are the secondary coils of an auto transformer, and that the coils shown in the middle of the long legs or sides are the filament coils that lead to the fluorescent lamp, making 6 coils in all. Appellant testified that those coils are the same or similar to those appearing in the print Exhibit No. 1.* Summarizing, appellant testified that the circuit shown in Exhibit No. 2 conforms to the circuit of the print Exhibit No. 1 in all respects. He likewise testified to the same similarity between Exhibit 3 and Fig. 1 of the patent.

In explaining Exhibit No. 4, bearing the date of February 10, 1943, and witnessed by John Farrow, appellant testified as follows:

"A. This sketch shows a rectangular core with six coils on it, two being primary and two the secondary of an auto transformer, with two filament coils placed in between, each set at a point where the secondary is in control of the filament windings. When the secondary is energized, making an arc in the lamp, the filament coils are automatically lowered to a value required by the lamp.

"Q. 25. Does this sketch, Exhibit No. 4, correspond to the patent circuit Fig. 1 thereof? A. Yes."

Appellant testified that he first conceived the idea of automatically starting the light in a fluorescent tube early in 1942. He then identified a device, Exhibit No. 6, which he stated was made in 1943,

prior to the making of Exhibits Nos. 2 and 3, and subsequent to the making of Exhibit No. 4. He said that he had shown the device and sketches to Percy A. Robinson and to Mr. Walsh he "just showed the sketches." Appellant explained the construction of that device as follows:

"A. It is a rectangular core with a primary divided into two coils, a secondary divided into two coils each and two tertiary windings which are filament energizers.

"Q. 40. Are the coils and core as described in Exhibit No. 6 the same as shown in the circuit diagram Fig. 1 of your patent? A. Yes.

"Q. 41. When you made the device, Exhibit No. 6, did you try it out in starting a fluorescent tube? A. Yes.

"Q. 42. Was it successful in lighting the fluorescent tube instantaneously when the current was turned on? A. Yes.

"Q. 43. What difficulties did you encounter, if any, in the operation of this device? A. They were all minor ones but on a rainy day it did not act as good as it did on better days, that is, on ordinary days of dry weather. We worked on it with the intent of improving them. Sometimes it blackened the ends of the fluorescent light after periods of usage and we tried to improve them.

"Q. 44. Could you give an estimate of how many times this particular device has been used in turning off and on a fluorescent tube? A. About that time we examined it, it had been going about thirty thousand times.

"Q. 45. How did you compute this? A. We had an automatic counting device that counted the times it started.

"Q. 46. Within what period of time did you make the thirty thousand test run? A. Probably a couple of days.

"Q. 47. Did the device operate successfully each one of the thirty thousand times? A. Yes. That is for thirty thousand times it turned the lamp on instantaneously. We had also an automatic device which marked down the times it started and the times it failed. If there was one time that it failed, we could see it on this graph.

"Q. 48. What did the graph show at the end of the two day period? A. That it did not fail for thirty thousand times, but the tube blackened on the ends so that it showed that if we could improve it, we should try anyway.

"Q. 49. Can you give an approximate date when you made the test run? A. About the last of February, 1943."

He stated that he had made about one hundred such devices between his first test and the date of his patent application. With respect to his tests of Exhibit No. 6, he stated that he did not consider it at that time to be satisfactory for commercial use because one filament burned out on one side more than the other which indicated that the number of turns on the other filament should be changed on one leg or the other of the rectangular core and in order to determine the best number of turns for each of the 6 coils he "just kept trying." He further stated that if he did not have enough amperes in the lamp the light would not be so bright and that the brightness is determined by the distance between the rectangular core legs, the number of turns in the secondary auto transformer, and the number of turns in the filament. Consequently, he had to keep varying the different proportions in order to determine what was the best number of turns, dimensions, and the like. He felt that the device approached satisfaction for commercial purposes about two months prior to the date of his application, August 27, 1946.

Another device, Exhibit No. 7, was said by appellant to be a "ballast" which he made with one Jacob Zager in the early part of 1944. That device had been running from that date until the time he testified.

Appellant said that he first started working with Mr. Zager in January, 1944, and that he began work on the device, Exhibit No. 7, about the 15th of that month. It took a week to finish and it was put on a light and lit in the ordinary usage. He stated that in the operation of the system one lamp burned out, but was replaced by an-

other which still could be lit. At that time appellant did not think his idea had been sufficiently advanced to justify him in applying for a patent for the reason that the transformer overheated and the insulation had burned off. However, he kept using it just the same because, as he said, it would still go on working unless it was disturbed by taking it off and in that event he would not dare to try to use it again. The reason for the overheating was attributed to the fact that the wires were too small and there were an insufficient number of turns. In any event, appellant continued to work on his idea until, as we have stated, he considered it sufficiently satisfactory to file his application for a patent.

It was the opinion of the board that the corroborating evidence of appellant's testimony was not sufficient.

One of those witnesses, William J. Walsh, Jr., is an electrician. He was handed a copy of Exhibit 1 and stated that he was familiar with the electrical circuit which is represented in Fig. 1 of the patent and of which the exhibit is a print copy. The pencil sketch made by appellant and witnessed by Mr. Walsh, Exhibit No. 2, was said by the witness to correspond to Exhibit 1 and that the device shown in the sketch operates in the same or similar manner as that of Exhibit 1. The witness testified that the sketch had been made by appellant before it was signed by him and that appellant told him he was working on an idea and I told him it would be well for "one of us electricians at the plant to * * * sign it for future reference."

Percy Robinson appeared on behalf of appellant. He is an electrician and was first told by appellant that he was working on a fluorescent tube that would be instant in starting sometime in March, 1943. He testified that Exhibit No. 3, which he had signed as a witness, represented the core of a transformer and that the spiral marks around the long legs of the rectangle adjacent one end represented a filament coil and that the shorter coils in the middle of the long legs were all there in conjunction with the transformer. He further testified that coils at the opposite end of the rectangle were for 110 voltage coming into the coil.

Jacob Zager, a chemist, testified that he had been associated with appellant in the making of a starter or "ballast" for the purpose of starting fluorescent tubes instantaneously. That association, he said, began in the early part of 1944 at about the time the witness started working with appellant. He testified that appellant had told him he had been working on his device and met some difficulties that had to be solved. The witness, in his work shop, possessed machinery for winding coils. He stated that one of the difficulties appellant encountered in the operation of his system was that the ballast would overheat and at times "would not start up the first time." The witness stated that the device, Exhibit No. 7, had been made with his winding machine in January, 1944. When shown Exhibit No. 1, he stated he was familiar with the circuit depicted there which was identical with that of Fig. 1 of the patent. He then said that the circuit in device, Exhibit No. 7, was the same as that shown in Fig. 1 of the patent. After Exhibit No. 7 was completed it was tested on a fluorescent tube which lit immediately, but the ballast overheated. After it overheated they did not continue the test much longer for fear that it would burn up.

Other devices, Exhibits Nos. 8, 9, and 10 were testified by the witness to possess circuits corresponding to the circuit diagram of Fig. 1 of the patent. He testified that all those device exhibits worked on were tested and that they all were wound according to the diagram set out in the patent.

He corroborated the statements of appellant in the various changes that had been made in order to satisfy appellant and was of opinion that most of the commercial difficulties had been ironed out in the early part of 1946.

Mr. Zager drew the sketch to be sent to the patent attorney so that he would know how the ballast operated and from that sketch the patent drawings were made.

John W. Farrow, a witness called on behalf of appellant, is an electronic engineer. He testified that he first learned that appellant was trying to make a ballast for a fluorescent tube, so that the tube would light instantaneously, sometime in 1942.

He testified that appellant had described to him what he was trying to do. A sketch, Exhibit No. 5, made by appellant is dated February 1, 1943, and signed by the witness on that date. He stated he understood how the device, an outline of which appeared on the sketch, would operate for the reason that he worked on the same thing. He clearly pointed out the different parts of the drawing appearing on the exhibit as a 40 watt fluorescent tube, the filament of the tube, the auto transformer, the 200 voltage secondary and 110 primary transformers. The witness had seen the device, Exhibit No. 6, in operation and the feature he noted was that it operated in cold as well as in normal weather. He testified that the device turned the fluorescent lamp on instantly. The witness was shown a pencil sketch, Exhibit No. 4, dated February 10, 1943, which bore his signature as a witness. He stated that he believed that the circuit diagram depicted in the sketch corresponds with the wiring of Exhibit No. 6, and set out in detail his reasons for so stating.

The witness Farrow amply corroborated the testimony of appellant as to when appellant described to him what he was trying to do and he understood what was contained in the drawings of the exhibits as well as in the device, Exhibit No. 6. He also stated that he had witnessed the test made by that exhibit on fluorescent lamps and that it worked.

It appears to us that the witness Zager thoroughly understood what appellant was striving to obtain and that he also observed the successful testing of the device exhibits. By his testimony it is clearly shown that appellant exercised constant diligence in his efforts to perfect his invention from January, 1944, which is prior to any date claimed by appellee, until his filing date.

The testimony of the witness Robinson shows that he knew in the month of March, 1943, that appellant was working on a fluorescent tube that would be instant-starting and the testimony of the witness concerning the exhibits that had been tendered him shows that he was thoroughly aware of the identity between the sketches and the patent drawing.

It may be further noted that all of the witnesses, with the exception of the witness Zager, were electricians and, to our way of thinking, certainly knew what they heard, saw, and testified to in a matter pertaining to the exercise of their chosen art. The witness Zager was a chemist, but his testimony convinces us that he was well informed as to appellant's system and that he thoroughly understood everything that was being done by appellant in connection therewith.

We are of opinion, in view of the above-related facts, that appellant conceived and actually reduced the invention to practice long prior to the earliest date claimed by appellee which is the latter part of 1944.

For the reasons hereinbefore set out, the decision of the Board of Interference Examiners is reversed.

Reversed.

JACKSON, J., retired, recalled to participate herein.